**LITE DePALMA GREENBERG, LLC**
Joseph J. DePalma
Katrina Carroll
Mayra V. Tarantino
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
(973) 623-3000
jdepalma@litedepalma.com
kcarroll@litedepalma.com
mtarantino@litedepalma.com

**CUNEO GILBERT & LADUCA, LLP**
Charles J. LaDuca
507 C Street NE
Washington, DC  20002
202-789-3960
jonc@cuneolaw.com
charles@cuneolaw.com

*Attorneys for Plaintiff*
[additional counsel on signature page]

<div align="center">

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

</div>

| | | |
|---|---|---|
| AMY E. KELLER, on behalf of herself and all others similarly situated, | : : : | Civil Action No.: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : : | **PLAINTIFF DEMANDS A TRIAL BY JURY** |
| | : | |
| JP MORGAN CHASE & CO. and CHASE HOME FINANCE, LLC, a wholly owned subsidiary of JP Morgan Chase & Co. | : : : | |
| | : | |
| Defendants | : | |

<div align="center">

**CLASS ACTION COMPLAINT**

</div>

1.      This is a putative class action on behalf of the Plaintiff and a class of all similarly

situated against JP Morgan Chase & Co. and Chase Home Finance, LLC (together, "JP Morgan,"

"Chase" or "Defendants").  The Plaintiff, Amy E. Keller ("Plaintiff" or "Ms. Keller"),

individually and on behalf of all others similarly situated, alleges as follows upon personal

knowledge as to her actions and upon information and belief based upon investigation of her

attorneys as to all other facts alleged in the Class Action Complaint.

## PARTIES

2.      Plaintiff Amy E. Keller resides at 8 Huddy Avenue, Highlands, New Jersey

07732.

3.      Defendant JP Morgan Chase & Co. is a Delaware corporation headquartered at

270 Park Avenue, New York, New York 10017, with offices in New Jersey.  JP Morgan

originates and services residential mortgages throughout the United States.

4.       JP Morgan Chase Bank, N.A. a subsidiary of Defendant JP Morgan Chase & Co.,

is a national banking association, and Defendant Chase Home Finance, LLC, is a subsidiary of

JP Morgan Chase Bank, N.A., headquartered at 343 Thornall Street Suite 7, Edison, New Jersey

08837.  Chase Home Finance, LLC is a primary servicer of residential prime and subprime

mortgage loans throughout the United States.  Upon information and belief, Chase Home

Finance is the third largest mortgage servicer in the country, servicing over 9 million homes.

5.      Upon information and belief, Chase Home Finance services loans originated by

Chase, as well as loans originated and/or owned by other lenders including Government

Sponsored Enterprises and private investors who hold pools of loans in securitized trusts.

## JURISDICTION AND VENUE

6.      This is a proposed class action.  This Court has subject matter jurisdiction over

this action pursuant to 28 U.S.C. § 1332(d)(2), because the vast majority of the putative class

(each individual member a "Class Member" and collectively the "Class Members") are of

diverse citizenship from the Defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of interest and costs.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331 as this civil action arises under the Constitution and laws of the United States.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here and Defendants regularly transact business in this District and are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

### Troubled Asset Relief Program

8.     On October 3, 2008, the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (codified as amended at 12 U.S.C. §§ 5201-5261, 31 U.S.C. §1105, and scattered sections of 26 U.S.C.), (the "EESA") became law.  Developed in response to the financial crisis facing the nation, EESA provided immediate authority and facilities that the United States Department of the Treasury could use to restore liquidity and stability to the financial system.  In this regard, EESA authorized the Secretary of the Treasury to establish the Troubled Asset Relief Program ("TARP") to "purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary, and in accordance with this Act and policies and procedures developed and published by the Secretary."

9.     JP Morgan received $25 billion in federal funds under the TARP program.  By accepting TARP payments JP Morgan agreed to participate in one or more programs that TARP authorized the Treasury Secretary to establish necessary to minimize foreclosures.

10.     As part of the TARP program, the Department of the Treasury introduced the Home Affordable Modification Program ("HAMP"), which provides guidelines for mortgage services to adopt to modify loans for homeowners in financial need.

11.     JP Morgan signed the Servicer Participation Agreement ("SPA") for HAMP in July, 2009.

12.     Upon information and belief, the SPA incorporates all "guidelines," "procedures," and "supplemental documentation, instructions , bulletins, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation."  The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."

13.     HAMP is a shared debt reduction program between the lender and the government.  Initially the lender reduces the homeowner's monthly mortgage payments to reflect no more than 31% of their gross income.  Thereafter, the Treasury Department steps in and offers financial incentives to the lender.

14.     Participation in the HAMP program is voluntary for servicers of non-Government Sponsored Enterprises (GSE), though all servicers for loans owned or guaranteed by Fannie Mae and Freddie Mac are required to participate.

15.     "Once a servicer is in HAMP, though, if a borrower meets certain eligibility criteria, participating servicers must run a test, known as a net present value (NPV) test, to evaluate whether a foreclosure or a loan modification would yield a higher value.  If the value of the modified mortgage is greater than the potential foreclosure value, then the servicer *must* offer

the borrower a modification."  "Examining the Consequences of Mortgage Irregularities for

Financial Stability and Foreclosure Mitigation," November 16, 2010 (hereinafter, "Congressional

Oversight Report") at 79.

16.     The benefit to the homeowner is a reduction in monthly mortgage payments.

17.     In order to encourage lenders and banks to take part in the program, the lender

also receives various financial benefits.

18.     Both the homeowner and mortgage itself must qualify to participate in HAMP.

19.     The HAMP protocol starts with homeowners providing the lender with required

documentation and information. The lender must determine 31% of the homeowner's gross

income and must then follow a three-step process to reduce the monthly payment to that 31%

amount.  The lender may reduce the interest rate to as low as 2%, extend the loan terms up to 40

years, and finally defer a portion of the principal if necessary until the loan is paid off.

20.     The first step in the loan modification approval process is for the homeowner to

take part in a 90-day trial period plan ("TPP") based upon the new loan modification monthly

payment. The borrower must remain current for the first three months or 90-day period.  If the

borrower's total monthly debt exceeds 55% of their gross income, the lender or bank must notify

the borrower in writing of HUD approved credit counselors. The borrower must complete a

credit counseling program and obtain a certificate.  If the homeowner's debt does not rise to the

55% level, the foregoing is not required.

21.     The lender must waive any late fees upon completion of the 90-day trial period if

the borrower successfully completes the trial.

22.     HAMP presumes that final modifications will be extended and finalized upon

completion of the TPP or shortly thereafter.  HAMP Supplemental Documentation dated

December 22, 2009 addresses situations in which the borrower has completed the TPP but has not yet received a permanent modification.

> In situations where an eligible borrower successfully completed the trial period (including providing the required documentation and making the required payments) and should have been converted to a permanent modification, but for reasons beyond their control were not timely evaluated for a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification.  If the borrower is eligible, then the servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than sixty days after discovering the error.

23.     Subsequent to a modification agreement being entered into by the homeowner and the lender, any foreclosure action will be temporarily suspended during the 90-day trial period. In the event that the HAMP or alternative foreclosure prevention options fail, the foreclosure action may be resumed. However, pursuant to HAMP, should the modification fail, banks and lenders are required to consider other programs before foreclosure, including but not limited to short sales and deed in lieu of debt.

24.     By entering into the SPA, JP Morgan covenanted that all services will be "performed in compliance with all Federal, state and local laws" specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices.

25.     Under the SPA, JP Morgan also covenanted that it would "perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well managed operation, and no less than which [JP Morgan] exercises for itself under similar circumstances," and that JP Morgan would "use qualified individuals with suitable training, education, experience and skills to perform the Services."

26.     JP Morgan has routinely failed to meet its obligations under the SPA and Program Directives as set forth below.

27.     Notwithstanding HAMP guidelines, "[s]ervicers have routinely failed to follow the loss mitigation guidelines contained both in the HAMP program and in the contracts of investors…, and the dual-track system of loss mitigation while also proceeding to foreclosure has resulted in foreclosures taking place before evaluation for loan modifications or other alternatives has occurred, while that process is occurring, or even after a successful modification agreement has already been reached."  Written Testimony of Julia Gordon, Center for Responsible Lending, Before the U.S. House of Representatives Subcommittee on Housing and Community Opportunity of the Committee on Financial Services, November 18, 2010, at 2 (hereinafter, "Gordon  Congressional Testimony").

<div align="center">

**Slipshod Practices Take Hold at JP Morgan**
**<u>With Respect to Documentation and Processing Foreclosures</u>**

</div>

28.     Defendants owe a duty of good faith and fair dealing with respect to borrowers, including Plaintiff and Class Members.  *See* Written Testimony of David Lowman, Chief Executive Officer for Home Lending at JP Morgan Chase, Before the Committee on Banking, Housing & Urban Affairs, November 16, 2010, at 1 ("JP Morgan Chase is committed to ensuring that all borrowers are treated fairly; that all appropriate measures short of foreclosure are considered; and that, if foreclosure is necessary, the foreclosure process complies with all applicable laws and regulations.").

29.     As a result of irresponsible lending practices, JP Morgan has had to deal with an unprecedented number of foreclosures.[1]

30.     Note holders and mortgage holders have the right to collect amounts due under a delinquent note and mortgage.[2]  However, they have the duty and responsibility, and indeed have contracted, to do so within the confines of the law and the judicial foreclosure process.

31.     Due in part to the overwhelming number of defaults and foreclosures that have had to be processed, slipshod practices took hold at JP Morgan, notwithstanding its statutory obligations under various statutory schemes, including the New Jersey Fair Foreclosure Act ("FFA"), N.J.S.A. 2A:50-53 et seq.[3]

---

[1] According to LPS Applied Analytics, a mortgage data firm, 2 million households are now in foreclosure and another 2.37 million households are seriously delinquent and waiting for their lenders to take action.

[2] When a consumer purchases a home and finances their purchase with a mortgage loan, three primary documents are executed in connection with the purpose of the property and the corresponding transfer of title.  The deed conveys ownership from one party to another and is recorded on the public record.  The mortgage, or deed of trust, is also recorded into the public record and is a lien on the property that notifies the public that there is a security interest in the property.  The mortgage gives the lender a contingent right to the house; it provides that if the borrower does not pay according to the terms of the note, then the lender can foreclose and have the property sold according to the terms of the mortgage and applicable laws.  The promissory note identifies the principal, interest rate, repayment schedule, and other terms of the loan, and is not publicly recorded.

[3] The FFA is a comprehensive statutory scheme that establishes uniform sheriff's sale procedures to be used in all mortgage foreclosure actions in New Jersey, a uniform sheriff's deed, an optional or strict mortgage foreclosure procedure without sale, as well as other provisions. Among other things, the FFA gives the residential mortgage debtor the right to cure the mortgage default prior to final judgment in a conventional mortgage foreclosure action with sale, and prior to the redemption order in the optional or strict mortgage foreclosure procedure without sale.

32.     JP Morgan engaged in a course of fraudulent and unconscionable conduct with respect to borrowers in connection with foreclosure procedures in order to accelerate the foreclosure process to obtain title over foreclosed property through unlawful means.

33.     Motivated by speed and profits rather than obligatory attention to detail, JP Morgan failed to record necessary documents to legally foreclose.

34.     To remedy the deficiencies in documentation and efficiency, JP Morgan, through its agents and employees, engaged in a systematic scheme of fabricating evidence in the form of fraudulent pleadings, affidavits and other documents that were used in foreclosure proceedings against homeowners.

35.     JP Morgan agents and employees issued fraudulent affidavits and assignments which purportedly proved JP Morgan's control of a mortgage and, if necessary, outsourced tasks to outside entities without adequate oversight.  As a result, JP Morgan and its agents failed to verify amounts borrowed and to determine which institutions had a right to foreclose prior to filling these fraudulent affidavits.

36.     JP Morgan "robo-signers" signed affidavits so quickly that JP Morgan could not possibly have verified the information in the documents being reviewed.  Document signers did not review the affidavits to determine whether all exhibits cited in the affidavit are attached to the affidavit, and JP Morgan employees failed to verify the accuracy of the contents of the affidavits before the document signer executed the affidavit.  The affidavits were not actually executed on personal knowledge of the document signer.  *See e.g.* Deposition of Beth Ann Cottrell, *Chase Home Finance, LLC v. Judith Koren, et al.,* Case No. 50-2008-CA-016857 (Circuit Court of the Fifteenth Judicial Circuit, Palm Beach County, Florida) May 17, 2010 (testifying that she signed off on thousands of foreclosures a month for JP Morgan Chase even

though she did not verify the accuracy of the information). These robo-signers often signed hundreds of documents per day without personal knowledge of their contents or accuracy. It is unlawful for an affiant to assume the facts contained in a draft affidavit are accurate without any independent knowledge, research, or verification, and then swear to having personal knowledge of the accuracy of those facts.

37. JP Morgan has routinely disregarded procedural safeguards provided to borrowers and has failed to properly review documentation submitted or relied upon in connection with foreclosure proceedings.

38. Defective documentation is routinely sent to JP Morgan foreclosure attorneys for use in judicial foreclosure proceedings.

39. JP Morgan has engaged in this misconduct despite the fact that it knew that these policies were improper, sanctionable, and unlawful.

40. JP Morgan breached its obligations to Plaintiff and Class Members by misrepresenting and/or failing to disclose the nature and scope of its egregious loan processing errors to Plaintiff and Class Members.

41. JP Morgan's failure to properly document and process paperwork, as described above, was the result of its standard business practices and operating procedures.

42. As a result of its systematic failure to properly document and process paperwork, JP Morgan has wrongfully foreclosed on thousands of properties throughout the United States, including in New Jersey.

43. JP Morgan has engaged in a pattern and practice of failing to review borrowers' documentation until several months after the initial institution of foreclosure proceedings.

44.     JP Morgan has initiated foreclosure proceedings on mortgages without holding the necessary rights as the mortgagee or assignee at the time of foreclosure, thereby forcing Class Members to defend against illegitimate lawsuits.

45.     JP Morgan has initiated foreclosure proceedings on mortgages even when the mortgagor was not in default, thereby forcing Class Members to defend against illegitimate lawsuits.

46.     The misconduct described above is the standard practice, policy and procedure of JP Morgan, and is consistent with its standard business practices and operating procedures.

47.     JP Morgan has engaged in a systematic effort to employ the legal process to further its abusive, fraudulent, unfair, and deceptive goal of obtaining title to property through fabricated and fraudulent statements and legal documents that are not properly notarized, in violation of law.

48.     JP Morgan had intent and knowledge prior to filing, as well as during and after, a foreclosure proceeding, that its agents would be submitting fraudulent affidavits and other unlawful documents to wrongfully obtain title to a foreclosed property.  In other words, JP Morgan knew foreclosure actions were filed that would be seeking to obtain title through fraud. Such knowledge and intent, which has been systemized inside JP Morgan's organization, renders those foreclosure proceedings fraudulent.

49.     JP Morgan has acted in a negligent, reckless, malicious, and/or fraudulent manner in initiating and/or continuing foreclosure proceedings when it knew or should have known that it could not sustain its burden of proof.

50.     As a direct and proximate result of JP Morgan's misconduct, Plaintiff and Class Members have suffered damages.  Specifically, Plaintiff and Class Members have suffered,

among other things, emotional distress, wrongfully being placed in imminent danger of losing

their homes, harm to their credit scores, depressed home values, impairment of the ability to sell

their property, and attorneys' fees involved in defending the fraudulent foreclosure proceedings.

Moreover, Plaintiff and Class Members have suffered damages, including, but not limited to,

uncertainty of clear title, which causes a smaller pool of potential buyers, lower home values,

real estate owned sales resulting in a higher deficiency judgment, and decreased time to negotiate

a modification or workout of the loan.

51.     Ignoring fundamental rights of property ownership, JP Morgan, through its

employees and agents, routinely and repeatedly perjured affidavits and executed ineffective

assignments in order to rapidly proceed with the foreclosures of Class Members' mortgages

without the necessary information and documentation.

52.     These perjured affidavits were signed by "robo-signers" who had no personal

knowledge of their contents or accuracy, and were submitted to the courts and sent through

interstate mails and wires, in furtherance and perpetuation of the fraud.

**JP Morgan's Unlawful Business Practices**
**With Respect to HAMP and JP Morgan Internal "Proprietary" Modifications**

53.     JP Morgan engaged in a course of widespread fraudulent and unconscionable

conduct with respect to borrowers in connection with loan modification applications.  JP Morgan

has misrepresented to consumers across the United States, including in the State of New Jersey,

whether they were eligible for modifications of their mortgage loans, when JP Morgan would

make a decision on their modification requests, whether JP Morgan had approved their

modification requests, why JP Morgan declined their modification requests, and whether JP

Morgan would foreclose upon their homes.  JP Morgan advertises its various homeowner

assistance programs on its website, including HAMP and Chase's Home Affordable

Modification Program ("CHAMP"), its own proprietary modification program.

54.     JP Morgan describes the loan modification process as follows on its website:

Step 1 - Initiating the Loan Modification Request

- Determine eligibility - Use our quick assessment tool to determine if you may be eligible for a loan modification.
- Prepare your application - Once you've confirmed that you're eligible, you'll need to complete the required documents. To ensure the security of your information, you can either log on to Chase Online and complete the forms in our secure Loan Modification Center, or download the forms as PDFs on your own computer.
- Gather your supporting documents - We'll provide a checklist of the required supporting documents (e.g., bank statements, W-2 forms) that you'll need to submit with your Request for Modification.
- Sign and submit your documents - Once you've completed and printed the required documents and gathered the required supporting information, fax or mail the complete package to Chase.

Step 2 - Review & Analysis

After we receive your package, a home retention specialist will review all the information you've submitted to confirm your eligibility for a loan modification.

- **This review process may take up to 30 days**.
- Your home retention specialist may request additional information from you and from third parties, such as appraisers or mortgage insurers.
- During this time, it's in your best interest to continue making your home loan payments.

Step 3 - Trial Period Plan

If your loan modification request is approved, you'll receive a letter from Chase explaining the terms of your loan, the amount of your new trial period mortgage payments and the next payment date. When you receive this letter, you'll begin a three-month Trial Plan. Making your mortgage payments during the trial period is essential, because it shows us that the new loan terms will work within your budget.

Step 4 - Final Modification Agreement

**If you successfully make your payments during your trial period, and the documentation you provided supports the home retention specialist's initial review, we will approve your request and your loan modification will become permanent.** When you've successfully completed the Trial Plan:

- We'll mail the loan modification agreement to you.
- You'll need to sign and return the Final Modification Agreement.
- Once we receive the signed final document, we'll conduct a final review. This review may take up to 30 days. Once we complete this review, the loan modification will be final.

https://www.chase.com/chf/mortgage/hrm_expect (last visited March 29, 2011), attached hereto as Exhibit A (emphasis added).

55.     Loan modifications, by which mortgage servicers change the terms of borrowers' mortgage terms, have been a cornerstone of public and private efforts to preserve home ownership in the recent financial crisis.  Through the modification process, servicers reduce borrowers' interest rates, extend their loan terms, and/or forgive or forbear principal in order to reach a monthly mortgage payment that borrowers can afford.

56.     A distressed borrower who is in danger of defaulting upon their loan, can negotiate a proprietary loan modification with JP Morgan.   JP Morgan will send the borrower a modification package which requires the borrower to fill out paperwork and supply certain proofs.

57.     Instead of providing the relief to which struggling borrowers are entitled—timely consideration for loan modifications that would make their mortgages affordable and a stop on foreclosure proceedings while they apply for and are evaluated for assistance, JP Morgan has subjected consumers to the following conduct: (1) initiating foreclosure proceedings or moving eligible borrowers toward foreclosure while their requests for loan modifications are pending; (2) failing to make timely decisions on modifications, leaving eligible borrowers in limbo for months or more; (3) failing to use its best efforts to secure investor approval of potential

modifications where such approval is necessary under the terms of a pooling and servicing agreement ("PSA").[4]

58.     JP Morgan has engaged in a pattern and practice of routinely delaying sending paperwork to its borrowers and also claiming that it has not received a borrower's paperwork, or that it was lost.  In fact, oftentimes consumers found out that their documents were allegedly missing or incomplete months after they submitted their modification requests, and only upon calling JP Morgan.  As a result, borrowers, who have been forestalled from attempting to pursue other options to prevent delinquency on their mortgage payments, end up in default through no fault of their own.

59.     While waiting for answers, consumers call JP Morgan regularly to check on the status of their modification requests.  They are promised calls or letters with updates, which almost never come.  Instead, many receive multiple foreclosure-related communications.  This long waiting period is not only inconsistent with JP Morgan's oral and written promises to consumers (including those promises made through online media), but extremely trying for homeowners who do not know from day to day whether they will get help or lose their homes.

60.     JP Morgan reports these borrowers, who were making modified payments during a trial period, as late or in default to credit bureaus.  As a result, Class Members' credit scores have been detrimentally affected, and significantly so, which substantially and negatively impacts their ability to rent if they lose their homes, among other problems.

---

[4] JP Morgan services securitized mortgages according to the terms of a PSA between the Bank as servicer, the mortgage owner, and the trustee appointed to act on behalf of the investors by the PSA.  Many PSAs include provisions on when and how JP Morgan may modify borrowers' mortgages, though under some agreements JP Morgan is delegated authority to modify mortgages without any approval from the trustee or investors.

61.     JP Morgan has a duty of honesty and disclosure to borrowers with respect to processing loan modification requests, settlements, and foreclosures.

62.     JP Morgan promises consumers on its website that its modification review process "may take up to 30 days." *See* Exhibit A.  JP Morgan's statements, especially considered with its other representations, create the impression that modification decisions will not drag on for six months or longer.

63.     JP Morgan has repeatedly breached its obligations to Plaintiff and Class Members and deceived homeowners about the loan modification process.  JP Morgan's deceptions and omissions include, but are not limited to, the following: (1) JP Morgan had properly processed modification documents; (2) consumers must be delinquent on their mortgage payments in order be considered for loan modifications, even though delinquency is not a condition of federal programs or JP Morgan's own loan modification programs; (3) JP Morgan would make decisions on modifications within a specified time frame, although the bank kept many consumers waiting months longer than promised; (4) JP Morgan would not foreclose upon consumers' homes while modification requests were pending or while homeowners were making trial modification payments; (5) JP Morgan had approved a loan modification, when it had not; and/or that (6) JP Morgan would convert consumers to permanent modifications if and when they made the payments required by trial modification agreements, although many consumers who successfully completed their trial periods have not received permanent modifications.

64.     JP Morgan has engaged in a pattern and practice of promising consumers, both in individualized communications and in public statements and materials, that their modification reviews would be completed in a particular period of time.  Notwithstanding its promises, JP

Morgan has imposed delay on many consumers far in excess of the time it promised it would take to make a decision on their loan modification requests.

65. JP Morgan blames most of the delays in processing loan modification requests on customer failure to provide required documentation. Yet, JP Morgan rarely sends consumers written notification that documents are missing, and often fails to notify consumers orally that documents are missing.

66. JP Morgan has engaged in a pattern and practice of advising and encouraging homeowners to not make payments on their loans while their loan modification applications are pending, claiming that they need to be delinquent on monthly mortgage payments to qualify for a loan modification, though there is no such requirement with respect to HAMP or JP Morgan's proprietary modification program.[5]

67. Class Members reasonably and actually relied on JP Morgan's representations with respect to suspending or reducing payments during the loan modification application process.

68. Despite its assurances, JP Morgan has advanced or completed foreclosures while homeowners are participating in modification plans or awaiting decision on loan modification requests. JP Morgan routinely forecloses upon these homeowners, who relied upon JP Morgan's representations and as a result failed to make payments during the loan modification process.

69. JP Morgan has engaged in a pattern and practice of representing to consumers that if they were approved for trial modifications, made each of their trial payments on time, and submitted required paperwork, they would receive permanent modifications.

---

[5] *See*, the Treasury Department's MHA Handbook, which can be found at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_20.pdf, at 19 (Sept. 22, 2010) ("A loan is eligible for HAMP if the servicer verifies that all of the following criteria are met:… The mortgage loan is delinquent or default is reasonably foreseeable.")

70.     Class Members reasonably and actually relied on JP Morgan's representations with respect to the potential to receive permanent modifications.

71.     Yet, even after consumers made several trial payments, JP Morgan did not place them in permanent modifications.

72.     JP Morgan has engaged in a pattern and practice of negotiating and approving loan modifications with borrowers, but later failing to provide the paperwork to conclude the modifications or denying their existence during the course of foreclosure proceedings, thereby causing homeowners to incur legal and late fees.  Plaintiff and Class Members reasonably relied on JP Morgan's representations with respect to the approval of their loan modification applications.

73.     During the trial modification period, JP Morgan, through its employees, representatives, members and/or contractors, has routinely represented to Class Members that their trial loans are actually permanent.

74.     Class Members reasonably relied on JP Morgan's representations, and continued to make the negotiated modified loan payments after the conclusion of the official trial period.

75.     Despite its promises and assurances, JP Morgan failed to adhere to its agreements by negligently and/or recklessly rejecting loan modification applications and/or treating Plaintiff and Class Members as being in default of their loans, notwithstanding that Plaintiff and Class Members tendered agreed upon payments, which JP Morgan accepted.

76.     JP Morgan has a financial interest in avoiding loan modifications and keeping mortgages in default in part because doing so generates more fees than modifying a loan to decrease its principal.  JP Morgan was motivated by the foregoing.

77.     Homeowners like Plaintiff and Class Members, who are denied a modification after making several months of trial payments, are worse off than if they had never started the trial at all, because the process damages their credit scores and they have expended funds which could have been used for other purposes.

78.     JP Morgan and its authorized agents made the previously described material misrepresentations and/or omissions with the intent and purpose of misleading borrowers, including Plaintiff and Class Members.  JP Morgan knew or should have known that its representations regarding the status of Plaintiff' and Class Members' loans, as well as the status of any purported modification were inaccurate and that Plaintiff and Class Members would act in accordance with and in reliance on JP Morgan's representations.

79.     JP Morgan's misrepresentations and omissions were material to the transactions at hand.

80.     JP Morgan's omissions and misrepresentations were made with the knowledge of their falsity, or with utter disregard and recklessness as to whether they were true or false, with the intent of inducing Plaintiff and Class Members into relying upon them.

81.     As a result of JP Morgan's misrepresentations and omissions, many consumers stopped making mortgage payments in a futile attempt to qualify for help.  Others waited months for—or never received—answers on their modification requests, all the while fearing that they would lose their homes; many actually lost their homes.  Some consumers were misled to continue making payments in the belief that they would be able to obtain modifications and keep their homes.  The Inspector General of the Troubled Assets Relief Program, which oversees HAMP, has stated that while consumers benefit from temporarily lower payments during their trial modification, consumers who are not converted to a permanent modification may end up

worse off.  *See* Office of the Special Inspector General for the Troubled Asset Relief Program, Quarterly Report to Congress at 12 (Oct. 26, 2010), available at http://www.sigtarp.gov/reports/congress/2010/October 2010_Quarterly_Report_to_Congress.pdf (borrowers in failed trial modifications who "even in circumstances where they never missed a payment… may face back payments, penalties, and even late fees that suddenly become due on their 'modified' mortgages that they are unable to pay, thus resulting in the very loss of their homes that HAMP is mean to prevent").

82.     Had JP Morgan provided borrowers with accurate information regarding the status of borrower loans, purported defaults, and what measures could be taken to cure the defaults or modify the loans, Plaintiff and the Class Members would have pursued other measures to cure a potential default, would not have defaulted, and/or would not have been led to believe that JP Morgan would assist the Plaintiff and Class Members in order to avoid default and be able to keep their homes.  Had they known they would lose their homes despite making payments, some consumers might have sought short sales or other foreclosure alternatives, or simply allowed their homes to be foreclosed, saving the money from the additional payments for other necessary expenses.  Other consumers lost willing buyers who could have mitigated their own (and JP Morgan's) financial losses by stepping in to purchase their homes.

83.     As a direct and proximate result of JP Morgan's misconduct, Plaintiff and Class Members have suffered damages.  Specifically, Plaintiff and Class Members have suffered, among other things, emotional distress, wrongfully being placed in imminent danger of losing their homes, harm to their credit scores, depressed home values, impairment of the ability to sell their property, and attorneys' fees involved in defending the fraudulent foreclosure proceedings.  Moreover, Plaintiff and Class Members have suffered damages, including, but not limited to,

uncertainty of clear title, which causes a smaller pool of potential buyers, lower home values,

real estate owned sales resulting in a higher deficiency judgment, and decreased time to negotiate

a modification or workout of the loan.

### Congressional Hearings and Reports

84.     The foreclosure crisis is truly a catastrophe, of the grandest proportions.  As a

result, Congressional hearings were recently held before the Senate Committee on Banking,

Housing, and Urban Affairs, and before the House Committee on Financial Services, Housing,

and Community Opportunity, in order to address the fact that people across the country are

needlessly losing their homes.  Numerous witnesses testified, including consumer advocates, law

professors, agency representatives and representatives of banks and mortgage servicers.

### Congressional Oversight Panel, November Oversight Report, Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation

85.     On November 16, 2010, the Congressional Oversight Panel issued a report:

"Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure

Mitigation" (hereinafter, "Congressional Oversight Report").

86.     As background, the Report explained that "[i]n earlier years, under the traditional

mortgage model, a homeowner borrowed money from a single bank and then paid back the same

bank.  In the rare instances when a bank transferred its rights, the sale was recorded by hand in

the borrower's county property office.  Thus, the ownership of any individual mortgage could be

easily demonstrated.  Nowadays, a single mortgage loan may be sold dozens of times between

various banks across the country… [As a result of] the sheer speed of the modern mortgage

market[,]… the financial industry developed an electronic transfer process that bypasses county

property offices" called MERS.[6]  Congressional Oversight Report at 4.  "This electronic process has… faced legal challenges that could, in an extreme scenario, call into question the validity of 33 million mortgage loans."  Congressional Oversight Report at 5.

87.     "[T]he financial industry now commonly bundles the rights to thousands of individual loans into mortgage-backed security (MBS).  The securitization process is complicated and requires several properly executed transfers.  If at any point the required legal steps are not followed to the letter, then the ownership of the mortgage loan could fall into question."  Congressional Oversight Report at 5.

88.     "If documentation problems prove to be pervasive and, more importantly, throw into doubt the ownership of not only foreclosed properties but also pooled mortgages, the consequences could be severe.  Clear and uncontested property rights are the foundation of the housing market.  If these rights fall into question, that foundation could collapse."  Congressional Oversight Report at 5.

89.     The Panel recognized that "[c]oncerns with foreclosure irregularities first arose when depositions of so-called 'robo-signers' came to light.  In a June 7, 2010 deposition, Jeffrey Stephan, who worked for GMAC Mortgage as a 'limited signing officer,' testified that he signed

---

[6] "A mortgage does not need to be recorded to be enforceable as between the mortgagor and the mortgagee or subsequent transferee, but unless a mortgage is recorded, it does not provide the mortgagee or its subsequent transferee with priority over subsequent mortgagees or lien holders…  During the housing boom, multiple rapid transfers of mortgages to facilitate securitization made recordation of mortgages a more time consuming, and expensive process than in the past.  To alleviate the burden of recording every mortgage assignment, the mortgage securitization industry created the Mortgage Electronic Registration Systems, Inc. (MERS), a company that serves as the mortgagee of record in the county land records and runs a database that tracks ownership and servicing rights of mortgage loans…  [MERS] attempted to create a paperless mortgage recording process overlying the traditional, paper—intense mortgage tracking system, in which MERS would have standing to initiate foreclosures."  Congressional Oversight Report at 19-20.

400 documents each day.  In at least some cases, he signed affidavits without reading them and without a notary present. He also testified that in doing so, he acted consistently with GMAC Mortgage's policies.[7]  Similarly, faced with allegations that robo-signers had signed tens of thousands of foreclosure documents without verifying the information in them, Bank of America announced on October 8, 2010, that it would freeze foreclosures in all 50 states until it could investigate and address the irregularities.  GMAC took similar action…"  Congressional Oversight Report at 11-12.[8]  "Then, on October 27, another large bank entered the fray when Wells Fargo announced that it had uncovered irregularities in its foreclosure processes and stated that it would submit supplemental affidavits in 55,000 foreclosure actions."  Congressional Oversight Report at 13.[9]

---

[7] "One judge determined that rather than being an isolated or inadvertent instance of misconduct… GMAC has persisted in its unlawful document signing practices even after it was ordered to correct its practices."  Congressional Oversight Report at 47 (internal quotation marks omitted) (citing *Federal National Mortgage Assoc. v. Nicolle Bradbury*, No. BRI-RE-09-65 (Me. Bridgton D. Ct. Sept. 24, 2010) (online at www.molleurlaw.com/themed/molleurlaw/files/uploads/9_24_10%20Four%20Motions%20Order.pdf).

[8] The Panel noted that there are two main concerns with affidavits.  "First: are the affidavits accurate?  For example, even if a homeowner is indebted, the amount of the indebtedness is part of the attestation.  The amount of the indebtedness must be accurate because there might be a subsequent deficiency judgment against the homeowner, which would require the homeowner to cover the remaining amount owed to the lender.  And even if there was no deficiency judgment, an inflated claim would increase the recovery of the mortgage servicer from the foreclosure sale proceeds to the detriment of other parties in the process.  Second, even if the information in the affidavit is correct, it must be sworn out by someone with personal knowledge of the indebtedness; otherwise it is hearsay and generally not admissible as evidence."  Congressional Oversight Report at 11, n. 14.

[9] The Panel stated that "[d]epositions have been taken in various foreclosure cases around the country that point to questionable practices by employees at a number of banks."  Congressional Oversight Report at 41 (citing Deposition of Xee Moua, *Wells Fargo Bank v. John P. Stipek*, No. 50 2009 CA 012343XXXMB AW (Fla. 15th Cir. Ct. Mar. 9, 2010)), at 11 n. 12 ("The details of 'robo-signers' actions surfaced on the Internet in September 2010, including video and transcriptions of depositions filed by robo-signers… Some of this information was made public

90.     The Panel did not attempt to ignore the potential implications of the "robo-signing" debacle, noting that in the "worst-case scenario[,]… the 'robo-signing' of affidavits served to cover up the fact that loan servicers cannot demonstrate the facts required to conduct a lawful foreclosure.  In essence, banks may be unable to prove that they own the mortgage loans they claim to own."  Congressional Oversight Report at 4.

91.     Regarding the possible legal ramifications of document irregularities, the Panel explained that as "a threshold matter, a party seeking to enforce the rights associated with the mortgage must have standing in court, meaning that a party must have an interest in the property sufficient that a court will hear their claim and provide them with relief.  For a mortgage, a mortgage may be enforced only by, or in behalf of, a person who is entitled to enforce the obligation the mortgage secures.  Thus, the only party that may enforce the rights associated with the mortgage, with standing to take action on a mortgage in a court, must be legally able to act on the mortgage.  Accordingly, standing is critical for a successful foreclosure, because if the party bringing the foreclosure does not have standing to enforce the rights attached to the mortgage and the note, that party may not be able to take the property with clear title that can be passed on to another buyer.  Thus, if prior transfers of the mortgage were unsuccessful or improper, subsequent transfers of the property, such as foreclosure or even an ordinary sale, could be affected.  Further, failure to foreclose property—whether because the foreclosing party did not actually hold the mortgage and the note, or because robo-signing affected the homeowner's due process rights—means that the prior homeowner may be able to assert claims

---

in court documents.  For instance, in an order issued by a state court in Maine on September 24, 2010, the judge noted that it was undisputed that Jeffrey Stephan had signed an affidavit without reading it and that he had not been in the presence of a notary when he signed it.").

against a subsequent owner of the property."  Congressional Oversight Report at 15 (internal

quotation marks omitted).

92.     Regarding the impact of foreclosures on individuals and communities at large, the

Panel noted that foreclosures have "many undesirable consequences… on individuals, families,

neighborhoods, local governments, and the economy as a whole…  Certainly, the injection over

the past several years of millions of foreclosed-upon homes into an already weak housing market

has had a deleterious effect on home prices."  Congressional Oversight Report at 73.  "Not

surprisingly,… researchers found a…decline in the value of the foreclosed home itself.  [One]

study indicated that foreclosure lowers a home's value by an average of 27 percent, much more

than other events, such as personal bankruptcy…"  Congressional Oversight Report at 75 (*citing*

John Campbell, Stefano Giglio, and Parag Pathak, *Forced Sales and House Prices*, Unpublished

manuscript (July 2010) (online at econ-www.mit.edu/files/5694) ("… the typical foreclosure

during this period lowered the price of the foreclosed house by $44,000 and the prices of

neighboring houses by a total of $477,000, for a total loss in housing value of $520,000." and

"Our preferred estimate of the spillover effect suggests that each foreclosure that takes place 0.05

miles away lowers the price of a house by 1%.")).  Moreover, "[i]f buyers suspect that homes,

especially foreclosed homes, may have unknown title and legal problems, they may be less likely

to buy, or at least they may lower their offers to account for the increased risks."  Congressional

Oversight Report at 78.

93.     As to HAMP, the Panel focused on concerns and motivations regarding "how

HAMP servicers have been calculating the costs of foreclosure under the program's NPV test.

Foreclosures carry significant costs leading up to the acquisition of a property's title. If, by

cutting corners in the foreclosure process, servicers were able to lower the cost of foreclosure

artificially, their own internal cost comparison analysis might have differed from the official

NPV analysis.  In such instances, servicers would have an incentive to lose paperwork or

otherwise deny modifications that they would be compelled to make under the program

standards."  Congressional Oversight Report at 81-82.

### SIGTARP Quarterly Report to Congress

94.     On January 26, 2011, SIGTARP, the Office of the Special Inspector General for

the Troubled Asset Relief Program, published its Quarterly Report to Congress (hereinafter,

"SIGTARP Report").

95.     The SIGTARP Report notes that "[o]ne of the biggest frustrations with HAMP,

… has been the abysmal performance of loan servicers…  Anecdotal evidence of their failures

has been well chronicled.  From the repeated loss of borrower paperwork, to blatant failure to

follow program standards, to unnecessary delays that severely harm borrowers while benefiting

servicers themselves, stories of servicer negligence and misconduct are legion, and the servicers'

conflicts of interest in administering HAMP—they too often have financial interests that don't

align with those of either borrowers or investors…."  SIGTARP Report at 12.

96.     That HAMP has been ineffective is almost universally acknowledged.  "The

numbers are remarkably discouraging.  According to RealtyTrac data, a record 2.9 million homes

received foreclosure filings in 2010, up from 2.8 million in 2009, and 2.3 million in 2008.

RealtyTrac predicts that filings will be 20% higher in 2011, crossing the 3 million threshold.

Similarly, the firm's data reveal that bank repossessions continue to increase, from just under

820,000 in 2008 to over 918,000 in 2009 to 1.05 million in 2010."  SIGTARP Quarterly Report

to Congress, January 26, 2011, at 11.

**Julia Gordon, Senior Policy Counsel at the Center for Responsible Lending**

97.     Julia Gordon, the Senior Policy Counsel at the Center for Responsible Lending, testified regarding mortgage servicers' predatory and illegal practices, both in the foreclosure process and leading up to foreclosure.  Gordon Congressional Testimony at 10.  She cited examples of unconscionable practices, including misapplication of borrower payments, resulting in inappropriate and unauthorized late fees and other charges; failing or refusing to provide payoff quotations to borrowers, preventing refinancing and short sales; improperly managing borrower accounts; and abuses in the default and delinquency process, including failing to properly send notices of default, prematurely initiating foreclosures during right to cure periods without proper notices to borrowers, and initiating foreclosure when the borrower is not in default or when the borrower has cured the default by paying the required amount.  Gordon Congressional Testimony at 10-11.

98.     Ms. Gordon testified that "servicers have violated HAMP guidelines and have resisted any kind of independent appeals process [which] has resulted in the widespread negative experience that so many homeowners and their advocates have had with the program.  For a whole range of reasons ranging from lack of capacity to conflicts of interest, mortgage servicers in many cases failed to provide many homeowners with a HAMP review that is timely, accurate, and adheres to HAMP guidelines."  Gordon Congressional Testimony at 17.

99.     Ms. Gordon described the confusing nature of the dual track system, pursuant to which servicers routinely pursued HAMP evaluations and foreclosures simultaneously. "Homeowners trapped in those parallel tracks received a confusing mix of communications, including calls and letters concerning evaluation for a modification, and other formal notifications warning of an impending foreclosure sale.  These mixed messages contributed to

the failure of some borrowers to send in all their documentation, the early re-default of many trial modifications, and the difficult servicers have in reaching certain borrowers." Gordon Congressional Testimony at 18-19.

100.    Servicers' practices with respect to processing modifications have harmed borrowers on a widespread basis. "First, for borrowers who entered into verified income trial modifications, servicer delays in converting trial modifications to permanent modifications… increase costs to homeowners and create significant periods of uncertainty… Second, homeowners who have received a stated income trial modification in good faith, have made all their trial payments in a timely way, but have been denied a permanent modification should not end up financially worse off than they were before the trial modification… [though currently,] they often do end up worse off.  Throughout the entire period, which is usually longer than three months since servicers are so backed up, these borrowers who are doing everything that is asked of them continue to be reported to credit bureaus as delinquent on their mortgage.  Moreover, since the trial modification payments are by definition less than the full contract payment under the mortgage and the terms of the mortgage are not altered during the trial modification, homeowners finish a trial modification owing more on their homes than when they started.  We have seen servicers use these arrears, accumulated during the trial modification, as the basis for initiating an immediate foreclosure against a homeowner…"  Gordon Congressional Testimony at 21.

101.    Ms. Gordon also noted that "[a]lthough HAMP trial modification contracts indicate that a homeowner can obtain a permanent modification by making three trial modification payments, servicers have been withdrawing trial modification offers, and, worse, cancelling existing permanent modifications, citing investor restrictions and other issues that

should have been identified prior to these agreements.  While servicers and others have sought to describe these cancellations as clerical errors, they are breaches of contract that epitomize the one-sided dynamic of HAMP modifications."   Gordon Congressional Testimony at 24.

### Diane E. Thompson, Of Counsel to the National Consumer Law Center

102.    Diane E. Thompson, of counsel to the National Consumer Law Center, explained that the current foreclosure scandal is symptomatic of servicers' "flagrant disregard" for the "basic legal and business conventions that govern most transactions."  Written Testimony of Diane E. Thompson, National Consumer Law Center, Before the United States Senate Committee on Banking, Housing, & Urban Affairs, November 16, 2010, at 3 (hereinafter, "Thompson  Congressional Testimony").  According to Ms. Thompson:  "Servicers rely on extracting payments from borrowers as quickly and cheaply as possible; this model is at odds with notions of due process, judicial integrity, or transparent financial accounting."  Thompson Congressional Testimony at 3.

103.    Ms. Thompson confirmed that "[t]he numbers and the narratives both tell the same story. Tens of thousands of homeowners are faithfully making monthly trial modification payments with the understanding that a permanent modification will be the reward, yet that final modification is still elusive."  Thompson Congressional Testimony at 48.

104.    Ms. Thompson described servicers' motivations as follows:  "Servicers… don't lose when they foreclose.  Servicers make money from force placed insurance and other excessive fees that push homeowners into default.  Servicers are able to minimize staffing and other costs when they fail to modify, without imperiling their income.  Servicers save money by engaging in robo-signing, and may even have been able to use robo-signing allegations to reduce their obligation to make advances—thus saving them even more money and shifting more of the

risk of failure to the top-rated tranches held by pension funds and other large institutional investors." Thompson Congressional Testimony at 5.  Upon information and belief, JP Morgan was motivated by the foregoing.

105.    "[D]elay serves servicers' interests.  During delay, fees and interest accrue… These fees will ultimately be paid to the servicer, either by the homeowner or from the proceeds of a foreclosure sale.  If, ultimately, the loan is modified, the servicers' monthly servicing fee will increase since it is calculated as a percentage of the outstanding principal, and the homeowner's principal balance will increase due to the capitalization of fees and back interest… Of course, the servicer must also advance the borrower's principal and interest payments to the investors every month, and delay increases the servicer's overall costs to borrow funds to make these advances.  But only when the costs of financing advances outstrip the additional accumulating fees do servicers have a meaningful incentive to end delay.  At that point, the scales will often tilt toward a foreclosure rather than a modification—in part because investor restrictions on how long a loan can be in default before modification may have been exceeded, in part because the accumulated arrearages may make any modification unsustainable, and in part because the time to recover those fees and any legitimate advances will be much shorter in a foreclosure proceeding than in a modification."  Thompson Congressional Testimony at 11-12. Upon information and belief, JP Morgan was motivated by the foregoing.

106.    Ms. Thompson stated that servicers' incentives incline them towards increased fees and foreclosures over modifications.  "Once a loan is in default, servicers must choose to foreclose or modify.  A foreclosure guarantees the loss of future income, but a modification will also likely reduce future income, cost more in the present in staffing, and delay recovery of expenses.  Moreover, the foreclosure process itself generates significant income for servicers…

the servicers' expenses, other than the financing costs associated with advances, will be paid first

out of the proceeds of a foreclosure… Whether and when costs are recovered in a modification

is more uncertain." Thompson Congressional Testimony at 20. Upon information and belief, JP

Morgan was motivated by the foregoing.

107.    Significantly, "[f]or servicers, the true sweet spot lies in stretching out a

delinquency without either a modification or a foreclosure. Income from increased default fees

and payments to affiliated entities can outweigh the expense of financing advances for a long

time. This nether-world status also boosts the monthly servicing fee and slows down servicers'

largest non-cash expense, the amortization of mortgage servicing rights, since homeowners who

are in default are unlikely to prepay via refinancing." Thompson Congressional Testimony at

20-21. Upon information and belief, JP Morgan was motivated by the foregoing.

108.    Consistent with the testimony of other witnesses, Ms. Thompson criticized the

dual track system. "Servicers rely heavily on the mechanized production of form documents in

processing both foreclosures and loan modifications. Any variation from the cookie cutter norm

imposed by the form documents causes delay and consternation… In part because loan

modifications often require more deviations from the norm, loan modifications often take more

time to work out than foreclosure. But the two-track system pushes the foreclosure forward

regardless, with the result that foreclosures frequently occur while homeowners are negotiating a

loan modification, sometimes even after they have been approved for a loan modification. Even

if a foreclosure never happens, the cost of the modification increases as the servicer imposes

various foreclosure-related (and often improper) fees on the homeowner, and the homeowner

suffers the financial, credit, and emotional toll of defending a foreclosure. The two track system

allows servicers to increase their profit from fees, through the imposition of foreclosure related

fees.  These fees are lucrative to the servicer, but can price a modification out of a homeowner's

reach.  Moreover, where there is little or no equity left in the home, reimbursement for these fees

will come out of the investor's pockets at any foreclosure sale or from future payments on the

loan."  Thompson Congressional Testimony at 29-30.

### Professor Adam J. Levitin, Associate Professor of Law at the Georgetown University Law Center

109.    Professor Adam J. Levitin, Associate Professor of Law at the Georgetown

University Law Center, agreed that the "mortgage foreclosure process is beset by a variety of

problems.  These range from procedural defects (including, but not limited to robo-signing) to

outright counterfeiting of documents to questions about the validity of private-label mortgage

securitizations that could mean that these mortgage-backed securities are not actually backed by

any mortgages whatsoever…"  Written Testimony of Adam J. Levitin, Associate Professor of

Law, Georgetown University Law Center, Before the United States Senate Committee on

Banking, Housing, & Urban Affairs, November 16, 2010, at Executive Summary (hereinafter,

"Levitin  Congressional Testimony").

110.    These problems are serious and should not be ignored.  "Irrespective of whether a

debt is owed, there are rules about who can collect the debt and how the rules of real estate

transfers and foreclosures have some of the oldest pedigrees of any laws.  They are the product

of centuries of common law wisdom, balancing equities between borrowers and lenders,

ensuring procedural fairness and protecting against fraud."  Levitin Congressional Testimony at

23.

111.    Professor Levitin explained that the current issues regarding fraud and misconduct

in the foreclosure process are "connected by two common threads:  the necessity of proving

standing in order to maintain a foreclosure action and the several conflicts of interests between

mortgage servicers and MBS investors… [P]roblems like false affidavits of indebtedness, false lost note affidavits, and false lost summons affidavits, as well as backdated mortgage assignments, and wholly counterfeited notes, mortgages, and assignments all relate to the evidentiary need to show that the entity bringing the foreclosure action has standing to foreclose… Concerns about securitization chain of title also go to the standing question; if the mortgages were not properly transferred in the securitization process…, then the party bringing the foreclosure does not in fact own the mortgage and therefore lacks standing to foreclose." Levitin Congressional Testimony at 2.

112.   Professor Levitin provided a summary of the mortgage contract and foreclosure process, noting in the first instance "that a default on the mortgage note is not a breach of the contract per se; instead it merely triggers the lender's right to foreclose per the applicable procedure."  Levitin Congressional Testimony at 12.

113.   With respect to robo-signing, Professor Levitin explained that "[a]ffidavits need to be based on personal knowledge to have any evidentiary effect… Personal knowledge for… an affidavit [about the existence and status of a loan] would involve, at the very least, examining the payment history for a loan in that servicer's computer system and checking it against the facts alleged in the complaint."  Levitin Congressional Testimony at 13.

114.   "The problem with affidavits filed in many foreclosure cases is that the affiant lacks any personal knowledge of the facts alleged whatsoever,  Many servicers, including Bank of America, Citibank, JPMorgan Chase, Wells Fargo, and GMAC, employ professional affiants, some of whom appear to have no other duties than to sign affidavits.  These employees cannot possibly have personal knowledge of the facts in their affidavits...  For a servicer's employee to

ascertain payment histories in a high volume of individual cases is simply impossible." Levitin Congressional Testimony at 13.

115.    Professor Levitin agreed that "[w]hen a servicer files an affidavit that claims to be based on personal knowledge, but is not in fact based on personal knowledge, the servicer is committing a fraud on the court, and quite possibly perjury.  The existence of foreclosures based on fraudulent pleadings raises the question of the validity of foreclosure judgments and therefore title on properties…" Levitin Congressional Testimony at 13.

116.    Lost note affidavits for notes that are not lost present similar problems.  "It appears that a surprisingly large number of lost note affidavits are filed in foreclosure cases… There are two problems with the filing of many lost note affidavits.  First, is a lack of personal knowledge.  Mortgage servicers are rarely in possession of the original note.  Instead, the original note is maintained in the fireproof vault of the securitization trustee's document custodian.  This means that the servicer lacks personal knowledge about whether a note has or has not been lost…  The second problem is that the original note is frequently not lost.  Instead, it is in the document custodian's vault.  Servicers do not want to pay the document custodian a fee (of perhaps $30) to release the original mortgage, and servicers are also wary of entrusting the original note to the law firms they hire…  Thus, many lost note affidavits are doubly defective:  they are sworn out by a party that does not and cannot have personal knowledge of the alleged facts and the facts being alleged are often false as to the note is not in fact lost, but the servicers imply does not want to bother obtaining it."  Levitin Congressional Testimony at 14.

117.    Professor Levitin agreed that because servicers recover costs of foreclosure actions off the top from foreclosure sale proceeds, the "reimbursement structure limits servicers'

incentive to rein in costs and actually [incentivizes] them to pad the costs of foreclosure.  This is done in two ways.  First, servicers charge so-called 'junk fees' either for unnecessary work or for work that was simply never done.  Thus, Professor Kurt Eggert has noted a variety of abusive servicing practices, including 'improper foreclosures or attempted foreclosures; imposition of improper fees, especially late fees; forced-placed insurance that is not required or called for; and misuse of escrow funds.'  Servicers' ability to retain foreclosure-related fees has even led them to attempt to foreclose on properties when the homeowners are current on the mortgage or without attempting any sort of repayment plan… There is also growing evidence of servicers requesting payment for services not performed or for which there was no contractual right to payment."  Levitin Congressional Testimony at 17.  Upon information and belief, JP Morgan was motivated by the foregoing.

118.     Professor Levitin also described additional problems, including that "[m]any foreclosure complaints are facially defective and should be dismissed because they fail to attach the note;" cases of "counterfeit or altered documents and false notarizations," standing issues related to "whether… notes and mortgages were in fact properly transferred to securitization trusts."  Levitin Congressional Testimony at 18-19.

### Kurt Eggert, Professor of Law, Chapman University School of Law

119.     Professor Eggert described the plight of borrowers as follows:  "Borrowers are at the mercy of their servicers, with some providing modifications, others not.  Some servicers promise modifications and then at the last minute yank the rug out from under borrowers by starting foreclosures even while negotiating a modification that might have prevented that foreclosure.  Some servicers push borrowers into foreclosures by the late fees the suspense accounts, and other means to squeeze their maximum gain from borrowers…"  Written

Testimony of Kurt Eggert, Professor of Law, Chapman University School of Law, Before the

U.S. Senate Committee on Banking, Housing, and Urban Affairs, December 1, 2010, at 4

(hereinafter, "Eggert  Congressional Testimony").

120.    Professor Eggert documented the "widespread misbehavior of mortgage servicers

in 2004, and defined 'servicer abuse' as follows:  'Abusive servicing occurs when a servicer,

either through action or inaction, obtains or attempts to obtain unwarranted fees or other costs

from borrowers, engages in unfair collection practices, or through its own improper behavior or

inaction causes borrowers to be more likely to go into default or have their homes foreclosed….

Servicing can be abusive either intentionally, when there is intent to obtain unwarranted fees, or

negligently, when, for example, a servicer's records are so disorganized that borrowers are

regularly charged late fees even when mortgage payments were made on time.'"  Eggert

Congressional Testimony at 6-7.

121.    Professor Eggert commented that "[o]n a regular basis, servicers attempt to

foreclose on property where either the borrower is current on the note or would be but for bad

behavior by servicers, or where the investors would benefit from a loan modification that the

borrower would be able to afford."  Eggert Congressional Testimony at 7.

122.    Significantly, "[e]ven when borrowers are able to stop the foreclosures eventually

and with great effort, they are still damaged by the servicers' behavior.  Borrowers who are the

victim of unwanted claims of default find their credit scores suffer and may find it more difficult

later to buy a house or refinance their loans.  They may even lose out on a new job or a

promotion as well."  Eggert Congressional Testimony at 8.

123.    Consistent with other witnesses, Professor Eggert agreed that "[s]ervicers often

have a great financial incentive pushing them toward foreclosure.  For example, servicers may be

attempting to recover advances or costs for a loan as they are paid first from the proceeds of the foreclosure.  Also, servicers may have a conflict of interest with the investor that could encourage them to foreclose on a loan quickly, in that the servicers' parent organization may benefit from a foreclosure."  Eggert Congressional Testimony at 8.  Upon information and belief, JP Morgan was motivated by the foregoing.

124.    "At the heart of abusive servicing is the charging of inappropriate fees, late fees, or other charges to which the servicer is not entitled."  Eggert Congressional Testimony at 8.  "It is difficult for borrowers to fend off improper fees.  They may not be certain, for example, whether a servicer received a payment late or just sat on the check for a day or two before processing it.  Borrowers may not be familiar with what fees their loan agreement authorizes, and may not recognize it when a servicer charges a fee not allowed by the loan documents."  Eggert Congressional Testimony at 9.   "Indeed, [n]ot only do mortgage servicers consistently claim that they are owed more than borrowers have scheduled, but also are view of their claims shows… 'many creditors do  not comply with applicable law governing claims.  Routinely, fees are not identified with specificity, making it impossible to determine if these charges are legal.  In most instances, mortgagees believe the debt is greater than debtors do; these differences typically represent thousands of dollars.  Yet, creditors are rarely called to task for these behaviors.'"  Eggert Congressional Testimony at 9 (quoting Katherine M. Porter, Mortgage Misbehavior, 87 Tex. L. Rev. 121, 162 (2008)).

125.    Impediments to modifications are considerable.  "[S]ervicers are faced with several dilemmas.  Borrowers that request modifications may sometimes cure their loans even without that potentially costly help.  Conversely, borrowers who receive loan modifications regularly redefault anyway, despite the labor and expenses by the servicers for the modification.

And so waiting and hoping might be a more economically sounds decision than modifying the loan." Eggert Congressional Testimony at 11.

126.    Professor Eggert complained that the "extensive use of robo-signers allows banks and servicers to foreclose on borrowers without regard to whether such foreclosure is proper and to hide from courts flaws in the banks and servicers documentation for the loans, be it bad records regarding mortgage payments or loan modifications or missing documents that would show whether the foreclosing entity even owns the loan it is trying to foreclose.  On a massive scale, servicers seemed to have been committing fraud on the court, submitting testimony from witnesses who had little idea of the contents of the affidavits they signed, let alone whether the affidavits were in fact true."  Eggert Congressional Testimony at 13.

### Hon. F. Dana Winslow, NYS Supreme Court Justice

127.    Judge Winslow, Justice in the New York State Supreme Court, testified before the House Committee on the Judiciary, U.S. House of Representatives, on December 2, 2010.

128.    Judge Winslow cited the following as examples of problems he sees on a recurrent basis:  "Deficiencies or defects in:  (i) the Plaintiff Mortgagee's proof of its right to foreclose and (ii) the Defendant Homeowners' notice of a foreclosure and their opportunity to attempt a loan modification or 'workout,' or otherwise protect their interests."  Written Testimony of F. Dana Winslow, Committee on the Judiciary, U.S. House of Representatives, December 2, 2010, at 1 ("Winslow Congressional Testimony").

129.    According to Judge Winslow, "[s]tanding has become such a pervasive issue that [he] frequently use[s] the term 'presumptive mortgagee in foreclosure' to describe the Plaintiff Mortgagee."  Winslow Congressional Testimony at 2.

130.    Judge Winslow described numerous issues related to proof of standing—demonstrating ownership of the note and mortgage—including possession of the actual Mortgage and the actual Note, gaps in the chain of title, retroactive assignments, robo-signing, and questionable validity of notary stamps on assignments.  Winslow Congressional Testimony at 2-3.

131.    With respect to modifications, Judge Winslow explained that Defendant Homeowners "rarely know whom to contact, and rarely have reasonable access to the appropriate person in the Plaintiff Mortgagee's office or the law firm representing the Plaintiff Mortgagee."  Winslow Congressional Testimony at 7.  Further, he described the dual track system as follows: "[f]oreclosure proceeds while modification/settlement is pending.  In several of my cases, the modification and foreclosure were being handled by separate departments within the same lending institution, and the modification department did not communicate with the foreclosure department.  The foreclosure sale took place while the Defendant Homeowner was waiting for a response on the modification."  Winslow Congressional Testimony at 8.

**Phyllis Caldwell, Chief of Homeownership Preservation Office,**
**U.S. Department of the Treasury**

132.    In recognition of failures in the system, HAMP procedures were changed in January 2010 so that servicers are required to send letters to borrowers with reasons for denial of a HAMP application.  Phyllis Caldwell, Chief of the Homeownership Preservation Office of the U.S. Department of the Treasury, testified that the HAMP program guidelines that became effective on June 1, 2010 "require participating mortgage servicers of non-GSE loans to: [e]valuate homeowners for HAMP modifications before referring them for foreclosure[;]… [s]uspend foreclosure sales against homeowners who have applied for HAMP modifications, while their applications are pending; [f]reeze all pending foreclosure actions when a borrower

makes the first payment under a fully verified trial plan[;]… [and p]rovide a written explanation to any borrower who is not eligible for modification and delay foreclosure for at least 30 days to give the homeowner time to appeal."  Written Testimony of Phyllis Caldwell, Chief of Homeownership Preservation Office, U.S. Department of the Treasury, Hearing before the House Committee on the Judiciary on "Foreclosed Justice: Causes and Effects of the Foreclosure Crisis, December 2, 2010 at 2 ("Caldwell Congressional Testimony").

133.    Pursuant to these guidelines, "[s]ervicers may not proceed to foreclosure sale unless and until they have tried these alternatives.  They must also first issue a written certification to their foreclosure attorney or trustee stating that 'all available loss mitigation alternatives have been exhausted and a non-foreclosure option could not be reached.'  On October 6[, 2010], Treasury clearly reminded servicers of non-GSE loans of this existing requirement that they are prohibited from conducting foreclosure sales until these pre-foreclosure certifications are executed.  It should be noted that GSEs have similar guidelines for their HAMP modifications."  Caldwell Congressional Testimony at 3.

**Daniel K. Tarullo, Member, Board of Governors of the Federal Reserve System**

134.    Mr. Tarullo testified before the Committee on Banking, Housing and Urban Affairs, U.S. Senate, on December 1, 2010.

135.    According to Mr. Tarullo, the "Federal Reserve serves as the primary federal regulator for two of the 10 largest servicers affiliated with banking organizations…  The Federal Reserve is participating with the other federal banking agencies in examining the foreclosure policies and practices of the other large institutions…  While quite preliminarily, the banking agencies' findings from the supervisory review suggest significant weaknesses in risk-management, quality control, audit, and compliance practices as underlying factors contributing

to the problems associated with mortgage servicing and foreclosure documentation.  We have also found shortcomings in staff training, coordination among loan modification and foreclosure staff, and management and oversight of third-party service providers, including legal services..."  Written Testimony of Daniel K. Tarullo, Member, Board of Governors of the Federal Reserve System, Before the Committee on Banking, Housing & Urban Affairs, U.S. Senate, December 1, 2010, at 4 ("Tarullo Congressional Testimony").

136.    "Regardless of the findings that emerge from the examinations underway, and the remedial actions required to correct past mistakes, this episode has again drawn attention to what can only be described as a perverse set of incentives for homeowners with underwater mortgages.  Homeowners who try to obtain a modification of the terms of their mortgages are all too frequently subject to delay and disappointment, while those who simply stop paying their mortgages have found that they can often stay in their homes rent free for a time before the foreclosure process moves ahead.  Moreover, many homeowners believe, reportedly on the basis of communications from servicers, that the only way they can qualify for modifications is by stopping their mortgage payments and thus becoming delinquent."  Tarullo Congressional Testimony at 11.

### Julie L. Williams, Chief Counsel and First Senior Deputy Comptroller, Office of the Comptroller of the Currency (OCC)

137.    "The OCC supervises all national banks and their operating subsidiaries, including their mortgage servicing operations. The servicing portfolios of the eight largest national bank mortgage servicers[10] account for approximately 63 percent of all mortgages outstanding in the United States – nearly 33.3 million loans totaling almost $5.8 trillion in

---

[10] Bank of America, Citibank, JP Morgan Chase, HSBC, MetLife, PNC, Wells Fargo, and U.S. Bank.

principal balances as of June 30, 2010.  To date, six large national bank servicers have publicly acknowledged deficiencies in their foreclosure processes." Written Testimony of Julie L. Williams, Chief Counsel and First Senior Deputy Comptroller, Committee on the Judiciary, U.S. House of Representatives December 2, 2010, at 1 ("Williams Congressional Testimony").

138.    Ms. Williams testified that "[a]s soon as the problems at Ally Bank came to light, we directed the largest national bank mortgage servicers under our supervision to review their operations, to take corrective action to remedy identified problems, and to strengthen their foreclosure governance to prevent reoccurrences. At the same time, we initiated plans for intensive, on-site examinations of the eight largest national bank mortgage servicers."  Williams Congressional Testimony at 2.

139.    OCC is "also reviewing samples of individual loan files… to test the validity of bank self-assessments and corrective actions, and to determine whether troubled borrowers were considered for loss mitigation alternatives such as loan modifications prior to foreclosures" and has "instructed examiners to be alert to, and document, any practices such a misapplied payments, padded fees, and inappropriate application of forced placed insurance as part of these file reviews."  Williams Congressional Testimony at 2.

140.    OCC is investigating concerns about improper foreclosure practices with respect to "requirements under some state laws for individuals to sign affidavits attesting to personal knowledge of the accuracy and completion of required documentation essential to a valid foreclosure proceeding… [and] whether… individual notaries may have violated procedures in notarizing documentation by, for example, notarizing the documents after they had been signed, rather than in the presence of the individual signing the affidavit."  Williams Congressional Testimony at 3.

141.     Ms. Williams testified that OCC "made clear" to the bank servicers it was investigating "that where deficiencies were identified, the servicers needed to take prompt action to remedy any improper documentation, including as applicable, making appropriate re-filings with local courts.  Equally important, we also directed banks to strengthen foreclosure governance to ensure the accuracy of the information relied upon in the foreclosure process and prevent reoccurrences of documentation problems."  Williams Congressional Testimony at 12-13.

### Stephanie Mudick, Head of the Office of Consumer Practices, JP Morgan Chase, and David Lowman, Chief Executive Officer for Home Lending, JP Morgan Chase

142.     Stephanie Mudick, head of the Office of Consumer Practices for JP Morgan Chase, testified before the Subcommittee on Housing and Community Opportunity, House Financial Services Committee, on November 18, 2010.  David Lowman, Chief Executive Officer for Home Lending at JP Morgan Chase, testified before the Committee on Banking, Housing & Urban Affairs on November 16, 2010.

143.     Both witnesses stated that "not every loan can be modified, for a variety of reasons[, including that] the mortgages [Chase] service[s] are serviced on behalf of others [and Chase] generally owe[s] those third parties… a contractual duty to maximize the return on the investment they made."  Written Testimony of Stephanie Mudick, Head of the Office of Consumer Practices, JP Morgan Chase, Before the Subcommittee on Housing and Community Opportunity, House Financial Services Committee, November 18, 2010, at 4 (hereinafter, "Mudick Congressional Testimony"); Written Testimony of David Lowman, Chief Executive Officer for Home Lending at JP Morgan Chase, Before the Committee on Banking, Housing & Urban Affairs, November 16, 2010, at 8-9 ("Lowman Congressional Testimony").

144.     According to the witnesses, "Chase's recent temporary suspension of foreclosure operations in a number of states arose out of concerns about affidavits prepared by local foreclosure counsel, signed by Chase employees, and filed in certain mortgage foreclosure proceedings.  Specifically, employees in [Chase's] foreclose operations area may have signed affidavits on the basis of file reviews and verifications performed by other chase personnel, not by the affiants themselves.  In addition, [Chase] discovered other related issues in connection in some of these affidavits, including instances in which notarized affidavits may not have been signed and affirmed in the physical presence of the notary…"  Mudick Congressional Testimony at 6; Lowman Congressional Testimony at 12.

145.     Ms. Mudick and Mr. Lowman admitted that Chase's "process was not what it should have been" and, to address these issues, "Chase temporarily halted all foreclosure proceedings and property sales in the 23 states where foreclosure primarily occurs through a judicial process and where affidavits are generally filed as part of the process."  Mudick Congressional Testimony at 6-7; Lowman Congressional Testimony at 12-13.  "Shortly thereafter, Chase also temporarily halted foreclosure proceedings in certain states where foreclosure primarily occurs through non-judicial process in order to assess whether similar documentation issues might exist in those jurisdictions."  Mudick Congressional Testimony at 7; Lowman Congressional Testimony at 13.

146.     Ms. Mudick and Mr. Lowman testified that Chase has undertaken remedial actions, including creating model affidavits that comply with law, training personnel, limiting factual assertions in affidavits to those with personal knowledge, and remedying issues with affidavits on file in pending proceedings.  Mudick Congressional Testimony at 7; Lowman Congressional Testimony at 13-14.  "Chase plans to re-verify the material information in filed

affidavits and file replacement affidavits prepared under the new enhanced procedures to eliminate any possible defects in those affidavits.  Chase is taking other appropriate measures in connection with foreclosure matters in which judgment has been entered but a sale has not yet occurred."  Mudick Congressional Testimony at 7; Lowman Congressional Testimony at 14.

### Industry Wide Deficiencies in Foreclosure Filings in New Jersey and Resulting Court Orders

147.    Legal Services of New Jersey prepared a "Report and Recommendations to the New Jersey Supreme Court concerning False Statements and Swearing in Foreclosure Proceedings" dated November 4, 2010.  The Report cites depositions and court filings in other states, demonstrating the systemic abuses in the filing of foreclosures that includes robo-signing.

148.    On December 20, 2010, New Jersey Chief Justice Stuart Rabner announced that after review of New Jersey Legal Service's Report, six lenders (including JP Morgan) that together have filed nearly 30,000 foreclosure actions in New Jersey in 2010 face the possibility of suspension of such operations.  General Equity Judge Mary C. Jacobson, who has been designated by Chief Justice Rabner to oversee foreclosure matters in the state, signed  an Order Directing the Named Foreclosure Plaintiffs[11] to Show Cause Why the Court Should Not Suspend the Ministerial Duties of the Office of Foreclosure and the Superior Court Clerk's Office Regarding the Processing of Certain Uncontested Residential Mortgage Foreclosure Actions, Stay the Sheriffs' Sales in Those Foreclosure Actions, Appoint a Special Master Pursuant to Rule 4:41-1 to Investigate Questionable Foreclosure Practices, and Appointing an Attorney to Appear in Support of the Proposed Relief (the "Order to Show Cause").

---

[11] The Foreclosure Plaintiffs are Ally Financial (F/K/A GMAC), Bank of America/BAC Home Loan Servicing LP, JP Morgan Chase/Chase Home Finance LLC, Wells Fargo/Wells Fargo Bank NA/ Wells Fargo Financial New Jersey, Inc., OneWest Bank FSB (F/K/A INDYMAC), and Citibank, NA/ Citi Residential Lending.

149.    The Court had "become increasingly concerned about the accuracy and reliability of documents submitted to the Office of Foreclosure… [and] therefore determined that immediate action in the form of an Order to Show Cause is necessary to protect the integrity of the judicial foreclosure process in New Jersey and to assure the public that the process going forward will be reliable."  Order to Show Cause at 2.

150.    "[T]he six Foreclosure Plaintiffs affected by this Order were selected based on a public record of questionable practices…"  Order to Show Cause at 2.

151.    The Court referenced "deposition testimony provided by employees of the… Foreclosure Plaintiffs taken in various states, as well as testimony regarding national foreclosure practices provided to Congress," raising "serious questions about the accuracy and reliability of documents submitted to courts by lenders and service providers in support of foreclosure complaints…"  Order to Show Cause at 3.

152.    The Court explained "that the execution of affidavits, certifications, assignments, and other documents in numerous residential mortgage foreclosure actions in New Jersey and elsewhere may not have been based on personal knowledge in violation of the Rules of Court…" Order to Show Cause at 3.

153.    In Administrative Order 01-2010, dated December 20, 2010, the Acting Administrate Director of the Courts, in connection with the Order to Show Cause, issued an order directed to "Foreclosure Plaintiffs filing 200 or more residential mortgage foreclosure actions in 2010" (the "Administrative Order"), requiring each to *inter alia* demonstrate affirmatively that there are no irregularities in their handling of foreclosure proceedings.

154.    The Administrative Order noted that "[n]ationally, six major institutions have recently been implicated in robo-signing activities: Bank of America; JPMorgan Chase; Citi

Residential; GMAC (now Ally Financial); OneWest Bank; and Wells Fargo."  Administrative

Order at 5.[12]

---

[12] **Bank of America**: As the robo-signing issue drew national attention, a deposition implicating Bank of America came to light, suggesting that Bank of America foreclosed on homes with the aid of documents executed en masse, in the absence of due diligence, by people with no knowledge of the information contained in the documents and no experience in the financial services or mortgage processing industry."  Administrative Order at 5.  "A signer for Bank of America said in a deposition taken in Massachusetts that she signed about 400 documents per day."  Administrative Order at 5, n. 13.  **JP Morgan Chase**: "Deposition testimony of an employee of Chase Home Finance, a division of J.P. Morgan Chase & Co., revealed that her team of eight people was responsible for signing affidavits, deeds, assignments, allonges, lost note affidavits, and lost mortgage affidavits.  Her team executed about 18,000 affidavits per month.  She did not personally review any information to determine the factual accuracy of documents she signed."  Administrative Order at 6.  **Citi**: "An individual employed by Nationwide Title Clearing, Inc., with signing authority for Citi Residential Lending, Inc., testified in a deposition that when he signed documents for Citi, he did not review them for substantive correctness.  Indeed, he could not even explain what precisely an assignment of mortgage accomplishes.  He had no prior background in the mortgage industry.  Further, a second person with signing authority for Citi Residential Lending, Inc., testified that she never reviewed any books, records, or documents before signing affidavits and that she instead trusted the company's internal policies and procedures to ensure the accuracy of the information she signed.  She signed several documents each day (in many instances without knowledge of what she was signing) and indicated that they were often notarized outside of her presence."  Administrative Order at 7.  **GMAC**: "The team leader of the document execution unit of GMAC Mortgage, LLC (now Ally Financial Inc.) testified in a deposition that his team of thirteen people executed approximately 10,000 "affidavits and things of that nature" per month.  The signer assumed that these documents were checked for accuracy prior to their submission for signing, though he lacked actual personal knowledge of their contents.  Notarization often occurred at a different time and place than signing, and signers would sometimes not check that all listed exhibits were attached to the affidavits they signed."  Administrative Order at 8.  **Wells Fargo**: "Wells Fargo employees have admitted in depositions to signing documents without verifying the information contained therein.  In one foreclosure case, a loan administration manager stated that he signed 50 to 150 documents per day, including assignments, declarations, and affidavits related to foreclosure.  He signed the documents without checking the information and relied on employees of another department to ensure the accuracy of the information.  The manager and others with the same position could sign as a Vice President of Loan Documentation for purposes of executing loan documents but were not otherwise officers of the company.  In another foreclosure case, an employee stated that she spent about two hours a day signing between 300 to 500 documents.  She held the title of Vice President of Loan Documentation for the purpose of signing the documents.  She did not review or have personal knowledge of the facts in the documents, relying on outside counsel or an employee in the foreclosure department for accuracy.  Similarly, for a bankruptcy case in Texas, a Wells Fargo employee stated that she sometimes did not personally review documents before signing, relying on the expertise of the document preparer."  Administrative Order at 9-10.

155.    JP Morgan submitted its response to the Order to Show Cause on January 5, 2011 ("JP Morgan Chase Bank, N.A. and Chase Home Finance LLC Response to Order to Show Cause"), arguing that the court need not stay sheriff's sales in certain foreclosure actions and need not appoint a special master to investigate questionable foreclosure actions.

156.    JP Morgan admitted, however, that it had identified "Instances when a Certification of Proof of Amount Due ("Certification") to be submitted in support of an application for final judgment were prepared, the calculation of the amount due and the review of the supporting financial information was often conducted by a Chase employee other than  the person who signed the Certification.  In addition, some Certifications included legal conclusions or other information that Chase personnel did not – and, as non-lawyers, often could not – verify."  JP Morgan Chase Bank, N.A. and Chase Home Finance LLC Response to Order to Show Cause at 2.

157.    In its submission, JP Morgan stated that "Chase recognizes… that its prior practices were inadequate and that Certifications were often submitted without the signer having the appropriate level of personal knowledge."  JP Morgan Chase Bank, N.A. and Chase Home Finance LLC Response to Order to Show Cause at 2.

158.    JP Morgan contends, notwithstanding the abundance of evidence cited in the Order to Show Cause, that it should be permitted to continue to monitor itself with respect to foreclosure actions.

### The Experiences of the Named Plaintiff

159.    On February 23, 2006, Plaintiff Amy E. Keller received an adjustable rate loan from Washington Mutual Bank, FA ("WaMu") in the amount of $262,500.00, secured by a mortgage on her home.  In September 2008, WaMu was purchased by JP Morgan Chase, and as

a result, JP Morgan Chase Bank, NA became the holder of the mortgage on Ms. Keller's home. Ms. Keller's communications with WaMu shall be referred to herein as communications with Chase or JP Morgan.

160.    In late 2008, Ms. Keller, like many Americans, began to experience financial difficulties and anticipated that she would have difficulty making her mortgage payments. Beginning in approximately December 2008, Ms. Keller contacted Chase to discuss alternatives to keep her from falling behind.  In December 2008 or January 2009, Ms. Keller was informed by a representative of Chase that she was ineligible for a loan modification and could only be considered for a modification if she defaulted on her loan and by failing to make three monthly payments.  Relying on that representation, Ms. Keller stopped making her mortgage payments.

161.    Beginning in March 2009, Ms. Keller began to receive collection notices from WaMu.

162.    On May 29, 2009, Ms. Keller received her first Notice of Intention to Accelerate and Foreclose from Chase.  Along with the notice, Ms. Keller received a letter of same date from Chase's Homeowner's Assistance Department advising "You are going through tough times – we can help.  In fact, we believe **your loan may be eligible for a loan modification program** – we may be able to change the term of your loan, the interest rate, and maybe even the principal due date, to reduce the monthly payment to an amount you can afford." (emphasis in original).

163.    Thereafter, Ms. Keller again attempted to contact Chase to request a loan modification. She made numerous phone calls to Chase and was routed to Chase's collections department.  During her phone conversations, Chase's collections personnel advised Ms. Keller that she would not be eligible for a loan modification until her account was brought current. These representations were in direct conflict with what Ms. Keller was initially told.

164.    In June 2009, Ms. Keller contacted the Chase Homeownership Center (which she found from her own research on the internet)  again to request a loan modification and on June 2, 2009, a Chase Homeownership Advisor (the "Advisor") emailed Ms. Keller the necessary forms to start the loan modification process.

165.    On or about June 16, 2009, Ms. Keller participated in a face-to-face meeting with her Advisor to discuss her loan modification request.  The Advisor assisted Ms. Keller in completing the necessary paperwork and guided her in the process.  During this meeting, the Advisor scanned all of Ms. Keller's relevant documentation into Chase's computer system.

166.    On June 21 and 23, 2009, Ms. Keller emailed the Advisor to check on the status of her loan modification application.  On June 23, 2009 and July 13, 2009, the Advisor confirmed receipt of Ms. Keller's application and advised that JP Morgan was waiting for a negotiator to be assigned to Ms. Keller's file.

167.    Ms. Keller again followed up with the Advisor as to the status of her application on August 18, 2009.

168.    On August 21, 2009, Ms. Keller filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code, and apprised Chase of that filing.  Ms. Keller had every intention of keeping her home. Thus, Ms. Keller's home and JP Morgan's lien thereon were abandoned and not a part of Ms. Keller's bankruptcy estate. Ms. Keller received her bankruptcy discharge on December 8, 2009.

169.    After filing for bankruptcy, on August 24, 2009, Ms. Keller again followed up with the Advisor as to the status of her loan modification.

170.    Having received no loan modification, on October 22, 2009, Ms. Keller again contacted the Advisor requesting an update on the status of her application.  On October 23,

2009, the Advisor responded and advised Ms. Keller that she would need to proceed through JP Morgan's bankruptcy department.

171.    Upon contacting JP Morgan's bankruptcy department, Ms. Keller was told that she needed to resubmit her paperwork for her loan modification.  She did so shortly thereafter.

172.    By letter dated November 3, 2009, JP Morgan advised Ms. Keller that it was cancelling her request for a "loan workout" because of a broken "trial plan" for the period 08/09-10/09.  Ms. Keller was verbally offered a modified payment of $500.00 on or about June 2009; however, Ms. Keller never received follow-up paperwork from JP Morgan memorializing JP Morgan's offer.

173.    In November 2009, Ms. Keller wrote the Advisor expressing her frustration with the loan modification process.  Ms. Keller informed the Advisor that after several months of being transferred from one department to another and submitting her loan modification documents *twice*, Ms. Keller still did not know the status of her modification.  In order to avoid further delays and as a gesture of good faith, Ms. Keller re-submitted the documents.  This was Ms. Keller's *third* submission of documentation.

174.    On December 5, 2009, the Advisor emailed Ms. Keller acknowledging receipt of Ms. Keller's package and advising that Ms. Keller's updated application was available on Chase's electronic documentation system.  The Advisor further informed Ms. Keller that she emailed the negotiator assigned to Ms. Keller's file regarding the trial plan Ms. Keller was offered, but had yet to receive a response.

175.    By letter dated December 7, 2009, JP Morgan advised Ms. Keller that it had not received all the documents necessary to complete Ms. Keller's application for loan modification.  JP Morgan requested that Ms. Keller forward (a) two most recent pay stubs for all borrowers, (b)

a completed, signed and dated 4506-T-Request for Transcript of Tax Return, and (c) a

completed, signed and dated Hardship Affidavit.  By separate letter of same date, JP Morgan

advised Ms. Keller that in order to complete Ms. Keller's request to participate in the

Homeownership Preservation Program, Ms. Keller needed to submit a completed hardship

affidavit.

176.    On December 21, 2009, Ms. Keller forwarded JP Morgan the requested

information.  This was now Ms. Keller's *fourth* submission to Chase.

177.    Ms. Keller did not hear from JP Morgan until February 4, 2010 when she received

a letter advising that JP Morgan was prepared to start foreclosure proceedings.  Along with this

letter, JP Morgan mailed Ms. Keller another letter of same date similar to the May 29, 2009 letter

advising of Ms. Keller's possible eligibility for a loan modification program.

178.    By letter dated February 9, 2010, JP Morgan advised Ms. Keller that she was

approved for a "Special Forbearance Agreement." The Special Forbearance Agreement was

enclosed and reflected a modified payment of $1,100.  Ms. Keller was advised that she was to

make three trial payments of $1,100 for the months March, April and May 2010.

179.    On February 24, 2010, Ms. Keller returned the duly executed Special Forbearance

Agreement to JP Morgan along with her first $1,100 payment.  Prior to executing the Special

Forbearance Agreement, Ms. Keller contacted Chase to ensure that her compliance with the

terms of the Agreement would result in a permanent loan modification.  The Chase

representative who spoke with Ms. Keller assured her that such compliance was the means to

secure her permanent modification, and that Ms. Keller would be assigned a Case Monitor from

Chase who would monitor Ms. Keller's compliance with the Agreement during the forbearance

period.

180.    Ms. Keller made all timely payments as required pursuant to her Special

Forbearance Agreement.

179.    On June 29, 2010, Ms. Keller again received a letter from JP Morgan advising of

its intent to start foreclosure proceedings. Again, Chase included a separate letter of same date

advising Ms. Keller of her possible eligibility for a loan modification program.

181.    Yet again on July 6, 2010, JP Morgan mailed Ms. Keller and Notice of Intention

to Accelerate and Foreclose along with a letter of same date advising of her eligibility for a loan

modification.

182.    On July 14 and 21, 2010, JP Morgan mailed Ms. Keller a letter advising:  "The

first step to your Chase mortgage modification is almost complete."  The letters further read:

"Thank you for making payments during *your trial mortgage modification period* – we would

very much like to make your modification permanent – but we still need some critical

documentation to finalize your modification evaluation."  (Emphasis added).  The documentation

needed was income documentation.  The letters further read:  "Luckily, you have a chance to

drop of the documentation in person because we're hosting a homeowner assistance event right

in your area."  The event was not in Ms. Keller's area, who lives in New Jersey, but in

Washington, D.C.

183.    On August 3, 2010, Ms. Keller emailed the Advisor to check on the status of her

application and recounted all of the steps Ms. Keller had taken to have her loan modification

application approved.  Ms. Keller informed the Advisor that she was told by JP Morgan

employee that she should pay her forbearance payments on time and she would then be contacted

by her Case Monitor and given a permanent loan modification.  Ms. Keller further advised that

she had continued paying the $1,100 for an additional three months, as she had not received any

response concerning her loan modification.  Ms. Keller asked the Advisor for guidance on what Ms. Keller should do next.

184.    On August 25, 2010, JP Morgan returned Ms. Keller's $1,100 payment for the month of August advising that it could not accept the payment because the funds were insufficient to cure the purported default. When Ms. Keller contacted Chase to inquire as to why her payment was being returned given her participation in the trial plan specified by her Special Forbearance Agreement, Ms. Keller was again referred to JP Morgan's collections department. The collections department advised Ms. Keller that because she continued to make her $1,100 trial payments while awaiting her permanent loan modification, Ms. Keller was nevertheless in default.

185.    On October 6, 2010, JP Morgan mailed Ms. Keller a letter acknowledging her request for a mortgage modification through the Making Home Affordable ("MHA") Program and enclosed another packet of information for Ms. Keller to complete.  Ms. Keller once again completed all of the forms and forwarded the completed application to Chase along with the requested financial information.  This was Ms. Keller's *fifth* submission.

186.    By letter dated October 21, 2010, JP Morgan confirmed receipt of Ms. Keller's request for a modification under the MHA Program and again advised of the information Ms. Keller must submit in order to qualify.  Despite the fact that Ms. Keller submitted all required information *five* times, on December 14, 2010, JP Morgan again wrote Ms. Keller advising that further documents (which had already been submitted) were needed.  In response, Ms. Keller, on January 13, 2011, forwarded to JP Morgan the requested information a *sixth* time.

187.    On January 14, 2011, JP Morgan yet again requested additional information that had already been provided multiple times.  On January 28, 2011, Ms. Keller complied, a *seventh*

time.  In response to yet another request for information by Chase, in February of 2011, Ms.

Keller sent in an *eighth* information package.

188.    On February 15 and 16, 2011, despite having provided documentation *eight* times,

Ms. Keller received an identical letter from JP Morgan advising that it could not offer her a loan

modification under HAMP because, incredibly, Ms. Keller failed to provide Chase with

requested documents.

189.    By letter dated February 28, 2011, Ms. Keller mailed JP Morgan a letter, via

registered mail return receipt requested, in response to its February 15 and 16 letters advising

that Ms. Keller on several occasions provided JP Morgan with the requested information.  Ms.

Keller detailed the dates on which JP Morgan asked for the identical information and the dates

on which Ms. Keller mailed JP Morgan the requested information.  Ms. Keller offered to resend

all information if JP Morgan was unable to locate the documents already sent to them or to

provide additional information, if necessary.  Notably, Ms. Keller did not receive the green

receipt card until March 11, 2011.

190.    As a direct and proximate cause of JP Morgan's deceptive practices as detailed

above, Plaintiff has suffered and will continue to suffer damages and economic loss in an amount

to be proven at trial, including but not limited to damage to her credit score and having to in all

likelihood defend against a wrongfully instituted foreclosure proceeding.

**Class Action Allegations**

191.    Plaintiff brings this suit as a class action on behalf of herself and all others

similarly situated (the "Class") pursuant to Fed.R.Civ.P. 23.  Plaintiff seeks to represent the

following class:

> All persons who are or have been obligors on notes and/or mortgages,
> and/or whose spouses or domestic partners have been obligors on notes

and/or mortgages, on property located in the United States serviced by JP Morgan and/or one of its named servicers. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest of Defendants, and Defendants' legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

192.    In the alternative, Plaintiff brings this suit as a class action on behalf of herself and all others similarly situated pursuant to Fed.R.Civ.P. 23, within certain, but not all, of the United States, as may be more specifically identified in subsequent motions to certify a Class, defined as follows:

All persons who are or have been obligors on notes and/or mortgages, and/or whose spouses or domestic partners have been obligors on notes and/or mortgages, on property located in certain, but not all, of the United States serviced by JP Morgan and/or one of its named servicers. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest of Defendants, and Defendants' legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

193.    In the alternative, Plaintiff brings this suit as a class action on behalf of herself and all others similarly situated within the State of New Jersey, pursuant to Fed.R.Civ.P. 23, defined as follows:

All persons who are or have been obligors on notes and/or mortgages, and/or whose spouses or domestic partners have been obligors on notes and/or mortgages, on property located in the State of New Jersey, serviced by JP Morgan and/or one of its named servicers. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest of Defendants, and Defendants' legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

194.    Plaintiff reserves the right to re-define the Class prior to moving for class certification.

195.    Plaintiff does not know the exact size or identities of the proposed Class, since such information is in the exclusive control of Defendants.  Plaintiff, however, believes that the Class encompasses thousands of individuals who are geographically dispersed throughout the United States, including within the State of New Jersey.  Therefore, the number of persons who are members of the Class described above are so numerous that joinder of all members in one action is impracticable.

196.    Questions of law and fact that are common to the entire Class predominate over individual questions because JP Morgan's actions complained of herein were generally applicable to the entire Class.  These legal and factual questions include, but are not limited to:

  a.  The nature, scope and operations of JP Morgan's wrongful practices;

  b.  Whether JP Morgan engaged in fraudulent practices as to Class Members;

  c.  Whether  JP Morgan's conduct amounts to a violation the New Jersey Consumer Fraud Act;

  d.  Whether JP Morgan's conduct amounts to a violation of the Fair Debt Collection Practices Act;

  e.  Whether Defendants breached their contracts, actual or implied, with Class Members;

  f.  Whether JP Morgan breached the covenant of good faith and fair dealing with Class Members;

  g.  Whether JP Morgan negligently processed loan modification requests, foreclosures, and settlements;

  h.  Whether JP Morgan had a policy and uniform practice of violating the New Jersey Fair Foreclosure Act, NJ Stat. Ann. 2A:50-52 *et seq.*;

i.      Whether Plaintiff and the Class suffered damages as a result of JP Morgan's misconduct and, if so, the proper measure of damages.

195.    Plaintiff's claims are typical of the members of the Class because Plaintiff and all Class Members were injured by the same wrongful practices of Defendants as described in this Complaint.  Plaintiff's claims arise from the same practices and course of conduct that gives rise to the claims of the Class Members, and are based on the same legal theories.  Plaintiff has no interests that are contrary to or in conflict with those of the Class she seeks to represent.

196.    Questions of law or fact common to the members of the Class predominate and a class action is superior to other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by Class Members are likely to be in the millions of dollars, the individual damages incurred by each Class member resulting from JP Morgan's wrongful conduct are, as a general matter, too small to warrant the expense of individual suits.  The likelihood of individual Class Members' prosecuting separate claims is remote and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action and certification of the Class under Rule 23(b)(3) is proper.

197.    Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the Class would be proper.  Defendants have acted or refused to act on grounds generally

applicable to the Class, thereby making appropriate final injunctive relief or corresponding

declaratory relief with regard to Class Members as a whole and certification of the Class under

Rule 23(b)(2) is proper.

## FIRST COUNT
## (Breaches of Contract)

198.    Plaintiff incorporates by reference the allegations contained in the preceding

paragraphs as though fully set forth herein.

199.    Plaintiff and Class Members entered into various contractual agreements with

Defendants that Defendants breached.

200.    Plaintiff and Class Members entered into binding modification agreements with

Defendants, which JP Morgan breached.

201.    The SPA and the explicitly incorporated Program Documentation constitute a

contract for which Plaintiff and the Class are intended beneficiaries, and under which JP Morgan

has undertaken duties to act for the benefit of Plaintiff and the Class.

202.    JP Morgan has breached its contractual duties by failing to provide eligible

borrowers with the opportunity to accept permanent loan modifications.

203.    In addition to duties to Plaintiff and Class Members based on their status as third-

party beneficiaries of the SPA, JP Morgan entered into individual contracts directly with

Plaintiff.

204.    As described above, JP Morgan offered Plaintiff a loan modification pursuant to a

TPP.

205.    By returning requested supporting documentation and making TPP payments,

Plaintiff accepted Defendants' offer.

206.     Alternatively, Plaintiff's offered to participate in a TPP with JP Morgan. Acceptance of this offer occurred when Defendants accepted Plaintiff's TPP payments.

207.     The calculation of reduced amounts payable under the contract and acceptance of the payment amounts to acceptance and execution of the TPP agreement by JP Morgan.

208.     Plaintiff's TPP payments to Defendants constitute consideration.  By making those payments, Plaintiff gave up the ability to pursue other means of saving her home, and Defendants received payment it might otherwise not have.

209.     Plaintiff and Defendants thereby formed valid contracts.

210.     To the extent that the contracts were subject to a condition subsequent providing JP Morgan an opportunity to review the documentation submitted by Plaintiff, this condition was waived by JP Morgan and/or it is estopped to assert it as a defense to Plaintiff's claims.

211.     Plaintiff and other Class Members made payments to Defendants in accordance with their modified loan agreements.

212.     By failing to offer Plaintiff and other Class Members permanent modifications, Defendants breached those contracts.

213.     Defendants breached their agreements with Plaintiff and other Class Members by failing to offer permanent modifications, by wrongfully denying the existence of the modification agreements, and/or by instituting or continuing foreclosure proceedings on loans that were not in default.  Even if JP Morgan did not breach an express term of the modification agreement, it breached an implied term that required them to extend offers for permanent modifications within a reasonable time period following the Plaintiff and other Class Members' performance under the trial modification programs.  At a minimum, Defendants should not have penalized Plaintiff and other Class Members for their compliance with the modified payments

demanding exorbitant balloon payments, charging them late and delinquency fees and reporting them to credit bureaus as in default.  Defendants' acts caused Plaintiff and other Class Members to be in a materially worse position than that which they were in before entering into the loan modification agreements with Defendants.

214.    JP Morgan routinely and regularly breaches its duties under both the SPA and their contracts with individual Class Members by failing to retain, employ, and supervise adequately trained staff; failing to provide written notices required by HAMP; and by deliberately acting to delay and otherwise frustrate loan modification processes; routinely demanding information already in its files; making inaccurate calculations and determinations of Class Members' eligibility for HAMP; and failing to follow through on written and implied promises.

215.    Class Members, including Plaintiff, remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

216.    Defendants also breached their residential mortgage agreements with the Plaintiff and Class Members by threatening foreclosure and/or instituting foreclosure proceedings when their purported defaults were actually caused by JP Morgan.

217.    As a direct and proximate result of the aforementioned wrongful conduct committed by Defendants, Plaintiff and the Class Members have suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.  Further, by making modified payments, Plaintiff and other Class Members forego other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home.  Plaintiff and other Class Members have suffered additional harm in the form of foreclosure activity against their

homes.  Further, Plaintiff and other Class Members have been living in a state of stressful anxiety because of the limbo in which Defendants has placed them.  Plaintiff and Class Members are entitled to damages and injunctive and declaratory relief as claimed below.

## SECOND COUNT
## (Promissory Estoppel, in the alternative)

218.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

219.    Defendants made a representation to Plaintiff and Class Members that if they submitted supporting documentation and made their TPP payments, they would receive a permanent HAMP modification.

220.    Defendants' TPP agreement was intended to induce Plaintiff and Class Members to rely on it and make monthly TPP payments.

221.    Plaintiff and Class Members did indeed rely on Defendants' representations, by submitting TPP payments.

222.    Given Defendants' representations, Plaintiff's and Class Members' reliance was reasonable.

223.    Plaintiff's and Class Members' reliance was to their detriment.  Plaintiff and Class Members have yet to receive permanent HAMP modifications.  By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.  In addition to the lost opportunity cost of pursuing other means of dealing with their default, when a permanent modification is not offered at the close of the three-month TPP, the borrower's permanent modification terms may be adversely affected and additional fees and charges may be applied.

Some members of the putative class also suffered additional harm in the form of improper fees and costs on their accounts and/or foreclosure/collection activity against their homes.  Last, Plaintiff and Class Members have been living in a state of stressful anxiety because of the limbo in which Defendants have placed them.

## THIRD COUNT
### (Breach of Covenant of Good Faith and Fair Dealing)

224.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

225.    JP Morgan has a duty of good faith and fair dealing with respect to their dealings with borrowers, including Plaintiff and the Class Members.

226.    There is an implied duty of good faith and fair dealing in every contract, and JP Morgan had an implied duty to insure that its loan modification and foreclosure procedures were not fraudulent or unconscionable with respect to borrowers.

227.    By entering into the SPA and accepting valuable consideration including funds from the U.S. Treasury, JP Morgan covenanted, on behalf of itself and its subsidiaries, to administer its contractual obligations with principles of good faith and fair dealing.

228.    Also, Plaintiff and Class Members negotiated their loan and modification agreements with Defendants from a position of unequal bargaining power.

229.    By virtue of their contractual relationship, Defendants had an implied duty to Plaintiff and the Class Members to take reasonable steps insure that all sums that they collected or attempted to collect under the loan and modification agreements with Plaintiff and the Class Members were legally due.

230.    JP Morgan breached the covenant of good faith and fair dealing by failing to take reasonable measures to ensure that it collected and/or attempted to collect the proper sums from

Plaintiff and Class Members; by failing to make good faith efforts to provide the loan servicing

functions owed to Plaintiff and the Class in connection with their review and retention of

documentation, including loan modification applications; by initiating foreclosure proceedings

without cause; by failing to properly supervise its agents and employees including, without

limitation, its loss mitigation and collection personnel and its foreclosure attorneys; by routinely

demanding information it has already received; by making inaccurate calculations and

determinations of Plaintiff' and Class Members' eligibility for HAMP; by failing to follow

through on written and implied promises; by failing to follow through on contractual obligations;

and by failing to give permanent modifications and other foreclosure alternatives to qualified

Plaintiff and Class Members, as described above.

231.    In so doing, JP Morgan acted recklessly, maliciously, in bad faith, and without

good cause, thereby preventing Plaintiff and the Class from receiving their reasonably expected

benefits under the contract.

232.    Plaintiff and Class Members relied to their detriment upon misleading assertions

and conduct of Defendants, and such reliance may be presumed based on the Defendants'

unlawful conduct.

233.    As a direct and proximate result of the aforementioned wrongful conduct

committed by Defendants, Plaintiff and the Class Members have suffered and will continue to

suffer damages and economic loss in an amount to be proven at trial.  By making TPP payments

both during and after the TPP, Class Members forewent other remedies that might be pursued to

save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other

strategies such as selling their homes.  In addition to the lost opportunity cost of pursuing other

means of dealing with their default, when a permanent modification is not offered at the close of

the three month-TPP, the borrower's permanent modification terms may be adversely affected and additional fees and charges may be applied.  Plaintiff and Class Members also suffered harm in the form of foreclosure and/or collection activity against their homes.  Plaintiff and Class Members have been living in a state of stressful anxiety because of the limbo in which the Defendants have placed them.  Plaintiff and Class Members are entitled to damages and injunctive and declaratory relief as claimed below.

## FOURTH COUNT
### (Fraud/Intentional Misrepresentation)

234.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

235.    Notwithstanding its duty of disclosure to Plaintiff and Class Members, JP Morgan knowingly and/or recklessly misrepresented and/or failed to disclose material facts relating to JP Morgan's loan modification and foreclosure processes to Plaintiff and Class Members, including but not limited to that: (1) JP Morgan had properly processed modification documents; (2) consumers must be delinquent on their mortgage payments in order be considered for loan modifications, even though delinquency is not a condition of federal programs or JP Morgan's own loan modification programs; (3) JP Morgan would make decisions on modifications within a specified time frame, although the bank kept many consumers waiting months longer than promised; (4) JP Morgan would not foreclose upon consumers' homes while modification requests were pending or while homeowners were making trial modification payments; (5) JP Morgan had approved a loan modification, when it had not; and/or that (6) JP Morgan would convert consumers to permanent modifications if and when they made the payments required by trial modification agreements, although many consumers who successfully completed their trial periods have not received permanent modifications.

236.    Defendants knew that Plaintiff and the Class were unaware of these material facts and could not reasonably discover the undisclosed facts independently.

237.    JP Morgan knew that its representations regarding the nature of their modification and foreclosure processes were false when made or made the misrepresentations recklessly, without any regard for their truth.

238.    JP Morgan misrepresented and/or failed to disclose the true nature of the modification and foreclosure processes with the intention that Plaintiff and Class Members rely on their representations.

239.    The misrepresentations, omissions and concealments complained of herein were material and were made on a uniform basis.

240.    Plaintiff and Class Members reasonably and actually relied upon JP Morgan's representations omissions and concealments.  Had Plaintiff and the Class Members been aware of the true nature of JP Morgan's business practices, they would have pursued other options to prevent delinquency on their mortgage payments to avoid foreclosure.  Such reliance may also be imputed, based upon the materiality of JP Morgan's wrongful conduct.

241.    JP Morgan's acts and misconduct, as alleged herein, constitute oppression, fraud and/or malice, entitling Plaintiff and the Class to an award of punitive damages to the extent allowed in an amount appropriate to punish or set an example of JP Morgan.

242.    As a direct and proximate result of the aforementioned wrongful conduct committed by JP Morgan, Plaintiff and the Class Members have suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.  Plaintiff and Class Members are entitled to damages and injunctive and declaratory relief as claimed below.

## FIFTH COUNT
### (Constructive Fraud/Negligent Misrepresentation)

243.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

244.    JP Morgan has a duty of good faith and fair dealing with respect to their dealings with borrowers, including Plaintiff and the Class.

245.    Notwithstanding its duty of disclosure to Plaintiff and Class Members, Defendants negligently and/or recklessly misrepresented and/or failed to disclose material facts relating to JP Morgan's loan modification and foreclosure processes to Plaintiff and Class Members, including but not limited to: (1) JP Morgan had properly processed modification documents; (2) consumers must be delinquent on their mortgage payments in order be considered for loan modifications, even though delinquency is not a condition of federal programs or JP Morgan's own loan modification programs; (3) JP Morgan would make decisions on modifications within a specified time frame, although the bank kept many consumers waiting months longer than promised; (4) JP Morgan would not foreclose upon consumers' homes while modification requests were pending or while homeowners were making trial modification payments; (5) JP Morgan had approved a loan modification, when it had not; and/or that (6) JP Morgan would convert consumers to permanent modifications if and when they made the payments required by trial modification agreements, although many consumers who successfully completed their trial periods have not received permanent modifications.

246.    The misrepresentations, omissions and concealments complained of herein were material and were made on a uniform basis.

247.    Plaintiff and Class Members reasonably and actually relied upon JP Morgan's misrepresentations and omissions.  Had Plaintiff and Class Members been aware of the true

nature of JP Morgan's business practices, pursued other options to prevent delinquency on their mortgage payments and would not have defaulted. Such reliance may also be imputed, based upon the materiality of JP Morgan's wrongful conduct.

248.   As a direct and proximate result of the aforementioned wrongful conduct committed by JP Morgan, Plaintiff and the Class Members have suffered and will continue to suffer damages and economic loss in an amount to be proven at trial. Plaintiff and Class Members are entitled to damages and injunctive and declaratory relief as claimed below.

## SIXTH COUNT
## (Negligent Processing of Loan Modifications and Foreclosures)

249.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

250.   Defendants owed Plaintiff and Class Members a duty of reasonable care in the processing and determination of their loan modification applications and the processing of their foreclosures.

251.   Defendants breached this duty by failing to properly evaluate Plaintiff and Class Members' loan modification applications and foreclosures. As a direct and proximate result of the aforementioned wrongful conduct committed by Defendants, Plaintiff and the Class Members have suffered and will continue to suffer damages and economic loss in an amount to be proven at trial. Plaintiff and Class Members are entitled to damages and injunctive and declaratory relief as claimed below.

## SEVENTH COUNT
## (Violation of the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. § 56.8-1, *et. seq.*)

252.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

253.    The acts and practices of Defendants as set forth above, have directly, foreseeably, and proximately caused ascertainable damages and injury to Plaintiff and Class Members in amounts yet to be determined as described in greater detail above, including but not limited to having been compelled to pay amounts in excess of their legal obligations to retain their properties and avoid foreclosure, having to retain counsel to challenge inaccurate and otherwise illegal impositions and charges, incurring additional late fees and charges while the improper fees and charges are challenged, and/or being reported to credit bureaus without cause.

254.    The actions of Defendants constitute acts, uses, or employment of unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise or real estate in violation of the CFA.

255.    As a result of Defendants' unlawful acts or practices, Plaintiff and the Class have been injured in amounts to be proven at trial, and Defendants should be ordered to pay, as damages to Plaintiff and the Class Members, attorneys' fees and costs, the ascertainable losses suffered by Plaintiff and Class Members, and such amounts should be trebled pursuant to the terms of the CFA, and Defendants should be enjoined from continuing to violate the law hereafter, as well as ordered to provide the other relief set forth below.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this case be certified and maintained as a class action and for judgment to be entered upon Defendants as follows:

A.      For economic and compensatory damages on behalf of Plaintiff and all Class Members;

B.      For actual damages sustained;

C.      For emotional distress damages, as applicable;

D.      For treble damages, as applicable;

E.      For punitive damages, as otherwise applicable;

F.      For declaratory relief, declaring that JP Morgan's actions are unlawful;

G.      For injunctive relief, compelling JP Morgan to cease its unlawful actions;

H.      For reasonable attorneys' fees, reimbursement of all costs for the prosecution of this action, and pre-judgment and post-judgment interest; and

I.      For such other and further relief as this Court deems just and appropriate.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Plaintiff respectfully demands a trial by jury on all issues so triable.


Dated:  March 29, 2011                      **LITE DePALMA GREENGERG, LLC**

                                            *s/  Joseph J. DePalma*
                                            Joseph J. DePalma
                                            Katrina Carroll
                                            Mayra V. Tarantino
                                            Two Gateway Center, 12th Floor
                                            Newark, New Jersey 07102
                                            (973) 623-3000
                                            jdepalma@litedepalma.com
                                            kcarroll@litedepalma.com
                                            mtarantino@litedepalma.com

                                            **CUNEO GILBERT & LADUCA, LLP**
                                            Charles J. LaDuca
                                            507 C Street NE
                                            Washington, DC  20002
                                            jonc@cuneolaw.com
                                            charles@cuneolaw.com

                                            **COHEN & HOWARD**
                                            Leslie Howard
                                            26 Ayers Lane
                                            Little Silver, NJ 07739
                                            (732) 747-5202
                                            lhoward@cohenandhoward.com
                                            *Attorneys for Plaintiff*

272217 v1                                   70

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Plaintiff, by her attorneys, hereby certifies that the matter in controversy is also the subject of the following actions:

1) *DeCaro, et al. v. JP Morgan Chase, et al.*, Civil Action No. 10-8993 (S.D.N.Y.)

2) *Boswell, et al. v. JP Morgan and Chase Mortgages Services, Inc.*, Civil Action No. 10-3456 (N.D.Ga.)

3) *Lopez, et al. v. JP Morgan Chase Banks, N.A.*, Civil Action No. 10-0078 (D.Ariz.)

4) *HPG Corp, et al. v. JP Morgan Chase Banks, N.A.*, Civil Action No. 09-12192 (D.Mass.)

5) *Figueroa, et al. v. JP Morgan Mortgage Corp. and JP Morgan Chase & Co.*, Civil Action No.10-61296 (S.D. Fla.)

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  March 29, 2011                    **LITE DePALMA GREENGERG, LLC**

                                    *s/  Joseph J. DePalma*
                                    Joseph J. DePalma
                                    Katrina Carroll
                                    Mayra V. Tarantino
                                    Two Gateway Center, 12th Floor
                                    Newark, New Jersey 07102
                                    (973) 623-3000
                                    jdepalma@litedepalma.com
                                    kcarroll@litedepalma.com
                                    mtarantino@litedepalma.com

                                    **CUNEO GILBERT & LADUCA, LLP**
                                    Charles J. LaDuca
                                    507 C Street NE
                                    Washington, DC  20002
                                    202-789-3960
                                    jonc@cuneolaw.com
                                    charles@cuneolaw.com

**COHEN & HOWARD**
Leslie Howard
26 Ayers Lane
Little Silver, NJ 07739
(732) 747-5202
lhoward@cohenandhoward.com

*Attorneys for Plaintiff*

# EXHIBIT A

# Chase
## Chase Homeownership Center

Homeownership Center  |  chase.com
## 866-550-5705



Currently playing: **1. Getting Started - 1:37**
Getting started
Your Initial Conversation
Initiating a Modification
Eligibility Review
Trial Period Plan
Final Agreement

### How To Keep My Home
**Loan Modification**
Other Retention Options
**Short Sale & Alternatives**
**Steps To Take**
**Other Resources**
**Find Us**

### Help is here: 866-550-5705
Call Center Hours (All times Eastern):
Monday - Thursday: 8am - 12am
Friday: 8am - 10pm
Saturday: 8am - 5pm

### Find a Homeownership Center:
Select a location
View

### Quick Links:
Download/Print Forms

Brooklyn, NY: Learn about our upcoming Homeowner Assistance Event

## Loan Modification

More and more Americans are struggling to keep up with their mortgage payments. One missed payment and you're facing default... and you feel as if there's nothing you can do. But it doesn't have to be that way. The sooner you talk to us, the sooner we can help. And, the more options you're likely to have available to you.

**What is a Loan Modification?**
A Loan Modification is a permanent change to the terms of a mortgage to make it more affordable for borrowers with a financial hardship.

**Find out if you are eligible**
Answer these simple questions to determine if you may be eligible for the Making Home Affordable or another Chase Loan Modification Program.

Find out if you are eligible

## What to Expect

**Four key steps in the loan modification timeline**

At the first sign of trouble in paying your mortgage, contact us right away. There are many possible outcomes and we evaluate each situation on a case-by-case basis. Loan modifications are the most common option that may be available to help customers like you.

Here are the four key steps we follow to support loan modification requests.

## Step 1 - Initiating the Loan Modification Request

**Determine eligibility** - Use our quick assessment tool to determine if you may be eligible for a loan modification.

**Prepare your application** - Once you've confirmed that you're eligible, you'll need to complete the required documents. To ensure the security of your information, you can either log on to Chase Online and complete the forms in our secure Loan Modification Center, or download the forms as PDFs on your own computer.

**Gather your supporting documents** - We'll provide a checklist of the required supporting documents (e.g., bank statements, W-2 forms) that you'll need to submit with your Request for Modification.

**Sign and submit your documents** - Once you've completed and printed the required documents and gathered the required supporting information, FedEx, fax or mail the complete package to Chase. Learn more about free FedEx shipping.

Find out if you are eligible

## Step 2 - Review & Analysis

After we receive your package, a home retention specialist will review all the information you've submitted to confirm your eligibility for a loan modification.

This review process may take up to 30 days.

Your home retention specialist may request additional information from you and from third parties, such as appraisers or mortgage insurers.

During this time, it's in your best interest to continue making your home loan payments.

## Step 3 - Trial Period Plan

If your loan modification request is approved, you'll receive a letter from Chase explaining the terms of your loan, the amount of your new trial period mortgage payments and the next payment date. When you receive this letter, you'll begin a three-month Trial Plan. Making your mortgage payments during the trial period is essential, because it shows us that the new loan terms will work within your budget.

## Step 4 - Final Modification Agreement

If you successfully make your payments during your trial period, and the documentation you provided supports the home retention specialist's initial review, we will approve your request and your loan modification will become permanent. When you've successfully completed the Trial Plan:

We'll mail the loan modification agreement to you.

You'll need to sign and return the Final Modification Agreement.

Once we receive the signed final document, we'll conduct a final review. This review may take up to 30 days. Once we complete this review, the loan modification will be

final.

There may be other alternatives before foreclosure if a modification is not available. They are spelled out under the Home Retention Options Section on this page. Even so, unfortunately, the threat of foreclosure is real for many Americans.

**What if foreclosure is the only option?**

Be assured, Chase does not want to foreclose on your property; however, for some, it may be the only option. In those cases, we work with our customers to make the process as smooth and as easy as it can be.

**What are the consequences of foreclosure?**

When a lender forecloses on your home, you lose your home and all the money you have invested in it. In addition, the foreclosure goes on your credit report and may affect your ability to obtain another mortgage in the future. In some states, you also can be held liable for any loss the lender experiences in selling the home.

The lender is required to report all foreclosures and deeds-in-lieu of foreclosure to the Internal Revenue Service. Because the IRS may view these events as forgiveness of debt, you may have increased tax liability. We recommend you consult with a tax advisor for additional guidance.

JPMorgan Chase Bank, N.A.        EQUAL HOUSING LENDER        Privacy Notice | Security | Accessibility | Terms of Use

A Warning For All Homeowners...
The federal government has issued the following warning:
"Borrowers should beware of any organization that attempts to charge a fee for housing counseling or modification of a delinquent loan. Especially if they require a fee in advance." Remember - Chase offers loan modification assistance free of charge - there is no modification fee. If anyone contacts you and says they will modify your mortgage for a fee, contact Chase, your lender, first.

This site is directed at, and made available to, persons in the United States of America. All mortgage loans offered through JPMorgan Chase Bank, N.A. All products are subject to credit and property approval. Rates, program terms and conditions are subject to change without notice. Not all products are available in all states or for all amounts. Other restrictions and limitations apply.

**Chase is a debt collector.**

This is a link to a third party site as described in our Weblinking Practices. Note that the third party's privacy policy and security practices may differ from Chase's standards. Chase assumes no responsibility for nor does it control, endorse or guarantee any aspect of your use of the linked site.

© 2011 JPMorgan Chase & Co.