```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2

 3    *In Re: JPMORGAN CHASE
      MORTGAGE MODIFICATION LITIGATION   No. 11-md-02290-RGS
 4    Related cases:

 5      11-cv-11804-RGS

 6      11-cv-11812-RGS

 7      11-cv-11817-RGS

 8      11-cv-11818-RGS

 9      11-cv-11830-RGS

10      11-cv-11831-RGS

11      11-cv-11838-RGS

12      11-cv-11839-RGS

13      11-cv-11840-RGS

14      11-cv-11841-RGS

15      11-cv-10380-RGS

16

17          BEFORE THE HONORABLE RICHARD G. STEARNS
                 UNITED STATES DISTRICT JUDGE
18                    MOTION TO COMPEL
                    November 26, 2012
19

20
                          Courtroom No. 21
21                        1 Courthouse Way
                          Boston, Massachusetts 02210
22

23
                  JAMES P. GIBBONS, RPR/RMR
24                 Official Court Reporter
                1 Courthouse Way, Suite 7205
25              Boston, Massachusetts  02210
                     jmsgibbons@yahoo.com
```

```
 1   APPEARANCES:

 2          KLEIN, KAVANAGH & COSTELLO (By Kevin Costello,
        Esq., and Gary E. Klein, Esq.) 85 Merrimac Street, 4th
 3      Floor, Boston, Massachusetts 02114, on behalf of
        Plaintiffs

 4

 5          MORRISON & FOERSTER, LLP (By Michael J. Agoglia
        and Angela E. Kleine, Esq.) 425 Market Street, San
 6      Francisco, California  94105, on behalf of Defendant

 7          BULKLEY RICHARDSON & GELINAS, LLP (By Donn A.
        Randall, Esq.) 98 North Washington Street, Suite 500,
 8      Post Office Box 6329, Boston, Massachusetts 02114, on
        behalf of Defendant

 9

10

11

12

13

14

15

16

17

18

19                              Courtroom No. 21
                                1 Courthouse Way
20                              Boston, Massachusetts 02210

21

22

                          JAMES P. GIBBONS, RPR/RMR
23                         Official Court Reporter
                        1 Courthouse Way, Suite 7205
24                       Boston, Massachusetts  02210
                            jmsgibbons@yahoo.com
25
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1                    P R O C E E D I N G S

 2          THE CLERK:  All rise for this Honorable Court.

 3      Court is open.  You may be seated.

 4      The case before this Court carries Case

 5  No. 11-md-02290, In Re: JPMorgan Chase Mortgage Modification

 6  Litigation.

 7          Counsel, please identify yourselves for the record.

 8          MR. KLEIN:  Gary Klein and Kevin Costello, Klein

 9  Kavanagh & Costello, for the plaintiffs.

10          MR. RANDALL:  Good morning, your Honor.  My name is

11  Donn Randall.  I'm here on behalf of JPMorgan Chase Bank and

12  the interrelated defendants.

13          MR. AGOGLIA:  Good morning, your Honor.  Michael

14  Agoglia, along with my colleague, Angela Kleine, from

15  Morrison & Foerster, on behalf of Chase as well.

16          THE COURT:  All right.

17      The reason I called a hearing, which I rarely do on

18  discovery matters, is that this must be the 17th motion I've

19  received that does not seem to me to do anything with

20  respect to the substance of the case but just exhibit a lack

21  of adult participation in what is happening, and I am,

22  frankly, getting frustrated with these endless motions to

23  continue, deadlines not met, documents being produced by the

24  truckloads on the last day of discovery, constant appeals to

25  the Court for intervention for, basically, handholding.
```

1        I need some sense of what is going on.

2        I have read what you are saying.  I understand the

3    indictments you each have served on the other, but this

4    sounds to me like -- I do not expect experienced lawyers of

5    your ability to be engaged in this kind of discovery

6    squabble.

7        So let's start with the plaintiffs who want yet another

8    continuance of discovery deadlines.

9            MR. KLEIN:  Yes, your Honor.

10       Without casting blame, this entire discovery process

11   has been arduous, contentious in every respect, antagonistic

12   frequently.  Every issue has been disputed, and often hotly

13   disputed.  It's, in fact, the most difficult discovery

14   process I've ever been a part of.

15       These are, hopefully, the final motions, and the

16   question for the Court is, really, whether the process is

17   going to end fairly, with a fair opportunity for plaintiffs

18   to gather the information they need to present their case

19   for class certification.  And, as you know, there are many

20   tens of thousands of homes across the country which continue

21   to be at stake in this litigation.

22       If possible, your Honor, I would like to divide this

23   hearing into parts consistent with the structure of the

24   Motion to Compel and talk to you a little bit about each

25   one.

1         But before doing that, I want to address the core of

2    the motion, which is that we received, only after the last

3    motion to compel, which you issued an order on on

4    September 21, we started receiving some of the core

5    documents we would have expected to receive very early in

6    the case.  We received audit documents on or about October 9

7    and October 19.  We received a data sample and

8    named-plaintiffs' data after hours on November 1.  So it

9    wasn't really available to us until November 2.  We received

10   all of the reports that -- or many of the reports that could

11   be relevant, and are relevant, to class certification, which

12   were mailed out on November 2 and received on November 5.

13        Our experts, quite understandingly, want some time to

14   take a look at the new material but, even more importantly,

15   what they want is a clear understanding of what the material

16   is.

17        We received some of the most complicated materials in

18   this case at the stroke of midnight in the discovery process

19   ordered by the Court.  Once we got a look at the materials

20   we received and saw how complicated and how important they

21   were, we immediately filed the present motion we filed on

22   November 9, your Honor.

23        I want to spend just a minute to talk about how we got

24   to this point in the discovery process and to deal with the

25   consistent argument that Chase makes that somehow the delays

1    in this process have been our fault.

2    Your Honor, there was no meaningful production of any

3    witness pursuant to Rule 30(b)(6) until August 2012.  I am

4    not trying to cast blame on this.  I believe the defendants

5    argued, and argued in a way that I understood and was

6    somewhat sympathetic to, that they should not have to

7    produce Rule 30(b)(6) witnesses until after the motion to

8    dismiss was decided.  I certainly understood they didn't

9    want to expose their witnesses on claims which might have

10    been dismissed, and understood that they had a legitimate

11    concern about the witnesses offering testimony that might

12    have been used to amend the complaint in the context of

13    dismissal proceedings.

14    The motion to dismiss wasn't resolved until the end of

15    July, your Honor, and, in fact, our discovery process has

16    been funneled into these last few months, since July 29.

17    All of the meaningful discovery in this case has happened

18    since the end of July.

19    We did not have significant or meaningful Rule 30(b)(6)

20    depositions until August.  And, in fact, each time we took a

21    Rule 30(b)(6) deposition, we were -- in light of Chase's

22    cat-and-mouse approach to discovery, we were first asking

23    those witnesses what kinds of documents they had relevant to

24    the topic for which they were produced.  So in each case

25    what we found out from witnesses is there were an array of

1    important documents: reports, audits, spreadsheets, data,

2    that they relied on to do their job, but which hadn't been

3    produced as of the 30(b)(6) depositions.

4        Once we learned of that material -- and, in fact, Chase

5    was telling us in the document discovery process that in

6    order for them to know what it is that we wanted produced,

7    we needed to give them more specific information -- we, in

8    fact, used the information that we gathered from 30(b)(6)

9    witnesses to go back to Chase and say, Now we have more

10    specific information.

11        At that point, they still refused to produce the

12    specific documents, which is why we filed the September 4

13    motion to compel, which you ruled on on September 21.

14        At that point, your Honor, we still didn't have almost

15    all of the reports that have now been produced.

16        We didn't have audits.  We didn't have any real data,

17    including data for the named plaintiffs.  That was all

18    produced at the end of November.

19        Our view, your Honor, is that what's fair here is that

20    we not lose the opportunity to ask Chase's witnesses about

21    these documents, which are central to the case, because

22    Chase delayed in their production until, in some cases,

23    early in November.

24        I want to dispose of two of Chase's arguments quickly.

25        First, Chase takes the position that we could have

1    asked witnesses about the sample data and the documents.

2        That's not true.  We didn't have them when the

3    witnesses were deposed.  We found out from the witnesses

4    about their existence.  We moved to compel.  We received

5    them at the end of the discovery process.

6        What's fair at this point is for us to have the

7    witnesses so that we can ask questions, and I'll walk you

8    through some of the documents so you can see how important

9    and complicated and, in some cases, arcane they are, and so

10   that we can get testimony and ask follow-up questions about

11   the structure of these documents, what they were used for

12   what the data fields mean, what codes are in them, how --

13   the methodologies that underlie their creation, et cetera,

14   all of which is relevant to class certification.

15       The other argument that Chase makes that I think should

16   be disposed of quickly is that we shouldn't be allowed at

17   this point to ask witnesses about the completion of the

18   production; that is, we shouldn't be allowed to -- in

19   Chase's view, we shouldn't be allowed to ask witnesses

20   whether Chase has, in fact, produced of all the documents it

21   promised the Court it was going to produce.

22       So, for example, when we received the production of

23   reports on November 5, what we discovered is they did not

24   produce a single report that predates March of 2011.  And,

25   if you remember, your Honor, the cases that are here all

1    have plaintiffs -- all of the disputed loan modification

2    processes are processes that arose in 2009 and 2010, so that

3    the reports that we got are for a time frame different from

4    the ones that are at the heart of this -- from the issues

5    that are at the heart of this case.

6        So we think it's fair for us to be able to ask a

7    witness about whether there were similar reports for the

8    earlier time frame.  And, in fact, if we find out that Chase

9    has concealed some of those reports, it wouldn't rule out

10   the possibility that, unless we get better cooperation, we'd

11   be back to you for a further ruling that we are entitled to

12   reports that explain what happened to the named plaintiffs

13   and to the class in their loan modification processes.

14       So the first part of this hearing, your Honor, I would

15   like to talk a little bit about the reports and spreadsheets

16   that were produced in response to your September 21 order.

17       As I said just now, it's not clear why nothing was

18   produced that predates March 2011.  These reports and

19   spreadsheets are complicated.  Neither counsel nor experts

20   can understand them without a witness to walk us through

21   both the data fields, how they were used, what data is

22   pulled in order to generate the reports, and the time period

23   for which they were in use.

24       I would like to, if you would indulge me, walk you

25   through one of the spreadsheets so you can get some sense of

1    what it is and why it's important and why we would have

2    questions about it, and why our experts have questions about

3    the documents.

4        I am going to use a spreadsheet that was produced by

5    defense counsel as part of their declaration in support of

6    their position on the motion to compel.  It's Exhibit 32 to

7    the Dresser declaration that was filed.  If you don't have

8    access to it, I brought a paper copy of what was filed.

9            THE COURT:  It would be easier if you handed up

10   one.

11           (Document handed to the Court.)

12           MR. KLEIN:  So, your Honor, this is a printed copy

13   of an Excel spreadsheet which, if you saw it in native

14   format, would have a variety of toggles and tabs.  And it's

15   used for the purposes, as far as we can tell, of identifying

16   the statuses of various borrowers in loan modification

17   processes and various loss mitigation activities at Chase.

18   It's relevant to part one of the complaint, which is about

19   failure to comply with HAMP temporary payment plan

20   agreements.  It's relevant to part two of the complaint,

21   which is a set of unfair trade practice claims, for the most

22   part, about Chase's failure to honor various promises to

23   modify loans.  And it's relevant to part three, which is

24   about the failure to honor permanent modifications.

25           And what you see, if you look at it, is that it's about

PDF created with pdfFactory trial version www.pdffactory.com

```
1    101 pages, and I will just focus you on a couple of the
2    pages so you can get some sense of both why it's relevant to
3    class certification and why we would necessarily have
4    questions about it.
5        If you look at page 5, your Honor, it's, essentially,
6    the opening page of the report.  It shows that it was
7    generated on April 27, 2012.  The page numbers are hard to
8    see, but they're at the bottom of each page.
9            THE COURT:  I want my law clerk to be able to see
10   this as we go along.
11           (Pause in proceedings.)
12           THE COURT:  Okay.
13           MR. KLEIN:  What it shows is that Chase was using
14   its own data to put people into various statuses in terms of
15   what's going on in their loan modification process.  And we
16   believe that similar reports, based on the testimony we
17   have, were kept throughout the class period, going back to
18   the beginning of 2008.  It's unclear to us why we have a
19   report from April of 2012 and not the reports from the core
20   of the class period, which is 2008 through the end of 2010.
21       And so what they are doing is they are counting
22   processes and giving them various statuses.  And, of course,
23   we have questions about what those -- how they're counting,
24   why they're counting, and what the statuses mean.  And that,
25   obviously, is information to the class certification issues
```

1  in this case, because the fact that Chase can use its own

2  data to put borrowers into statuses based on where they

3  stand in the loan modification process is exactly what, we

4  would propose, would allow us to identify class members for

5  the purposes of ascertainability under Rule 23.  It would

6  allow us to evaluate typicality by comparing the status they

7  attribute to the named plaintiffs to the status of other

8  people.  It's important to numerosity, in the sense that you

9  can see how many people are in the various statuses.  And

10  it's important to commonality, because if people are in the

11  same status and we can show that the reasons they're in the

12  same status are the same, what that means is that the

13  borrowers are -- the class members' experiences are common

14  experiences.

15       If you would turn next to page 36 of this report.

16       I may have that wrong.  I'm sorry.

17       Page 31 of the report.

18       This is a single status, your Honor.  This is a set of

19  applicants who reapplied from an incomplete package.  And,

20  of course, we would have questioned if we had had this when

21  a witness was available to testify about it, about what it

22  means to be in this status, "re, Application from an

23  Incomplete Process Package."  How was it that people are

24  determined to have had an incomplete package, and how is it

25  that they get assigned to the various sub-statuses, which,

1    if you look at them, are arcane and hard for anybody who is

2    not a Chase employee to understand.  It's also very hard to

3    understand how the people are counted and assigned to

4    statuses.  So, really, we have questions about how this

5    spreadsheet works.

6         If you turn next to page 56, your Honor.

7         I apologize that we couldn't print it out any larger.

8    In fact, I need to take my glasses off in order to read it.

9         What this does, as far as we can tell, is it assigns

10   people to statuses based on the number of days that their

11   processes have taken.  And that is the core issue for at

12   least part of the complaint, whether Chase was honoring

13   their promises to modify loans within the time periods in

14   the contract.

15        And so what these -- this document would show, or what

16   we think it would show, if we could ask a witness about it,

17   is the circumstances in which Chase did not complete its

18   evaluation of the borrower's application in the time frame

19   required by the modification agreements that they entered

20   into with borrowers.

21        So the bottom line here is, you know, that these are

22   complicated documents.  These are documents that we've been

23   asking for since the very beginning of the discovery period.

24   We first served our request for production last February.

25   We received them on November 5.  Our experts have looked at

1     them.  Our experts have questions about documents like this.

2     We'd like to know why we don't have similar documents from

3     2009 and 2010.  And we'd like to know what many of the

4     statuses and fields mean.  And we think it's fair at this

5     point for us, having received this production at the very

6     last minute, to get a witness so that we can ask questions

7     about the documents, not just this document, but other

8     similar documents that were produced at the eleventh hour.

9          We have the same issues for the data sample that was

10    produced.  It was produced in a very complicated way, and

11    we've given you a small sample of the data sample and the

12    name-plaintiffs' data that was produced.  They're at

13    Exhibits 4 and 5 to the declaration, my declaration, that

14    was filed with this motion.

15         Each borrower in the data sample has a series of

16    snapshots of their loan modifications data over a period of

17    time, and I think it's fair for us to have an opportunity to

18    ask what the field names in the data sample mean and how

19    they're used; to ask what the presence or absence of data in

20    a particular field might mean; to ask, where data codes are

21    used rather than, obviously, understandable information,

22    what those codes mean; and I think it's fair for us to ask

23    how the fields that are in the data sample are used for

24    Chase's own analysis of its data.

25         And, again, it's not our fault that we didn't get them

PDF created with pdfFactory trial version www.pdffactory.com

 1    until November 1.  Chase did not produce them until you

 2    compelled them, and then took an additional 35 days in order

 3    to prepare and produce them.  We started asking for this

 4    material immediately after your September 21 motion to

 5    compel order.

 6         On September 24, we sent an initial meet-and-confer

 7    letter.  We asked when the data was going to be produced,

 8    what formats it was going to be produced in, what field

 9    codes would be used, so that our experts could be ready when

10    it came in.  And, in fact, we just didn't get information.

11    There are literally 14 to 18 discovery letters in the period

12    of time between September 24 and November 1 when this was

13    produced which reflect the fact that we weren't getting

14    answers to basic questions about the data sample that would

15    have allowed us to understand it.

16         We have the same issue for audits, your Honor.

17         Audits are very important to this case.  Chase used a

18    variety of auditors, both government entities and private

19    auditors, to go through its loan modification data.

20         We had asked for audits in February.  That is very

21    clear in our motion -- in our request for production of

22    documents.

23         We worked our way through a set of issues where Chase

24    consistently told us that we had to identify the audits we

25    were looking for.

1      We had to wait to get witnesses who we started to ask

2   about audits.  We learned the names and functions of some of

3   the audits.

4      We then moved to compel in September.  You ordered it

5   September 21.

6      Audits arrived in our offices in mid October.  They're

7   heavily redacted.  In many places there are pages and pages

8   of materials that are redacted.

9      We started asking about why the redactions are in the

10  documents.  Chase blames us for wanting a witness to find

11  out about the redactions, but the reality is we couldn't

12  have even known why they were redacted until a meet and

13  confer that occurred, if I'm not mistaken, on October 31.

14      At that point we learned that they were redacted for

15  relevance, which was news to us that there would be audits

16  that were produced with irrelevant materials, but certainly

17  we should be allowed to find out more not just about the

18  redactions but about what is present in the audit, which are

19  identified problems, and how -- we'd like to know a little

20  bit more about how Chase responded to them.

21      We haven't had a witness.  We haven't had an

22  opportunity to ask somebody about audits because we didn't

23  have them until late October.

24      That is the first piece of the presentation I want to

25  make, that these issues go to whether or not we shouldn't be

PDF created with pdfFactory trial version www.pdffactory.com

1    allowed to have an opportunity to have Chase's testimony

2    about these exhibits.

3        If you prefer, we could -- you could allow Chase's

4    counsel to talk about those issues.  I would like to come

5    back and talk about the other witness issues and the data

6    issues, if you choose to proceed that way.

7            THE COURT:  Why don't you put all three on the

8    table, and I'm certainly going to hear from Chase.

9            MR. KLEIN:  Certainly, your Honor.

10       There are two sets of other witness issues that we

11   finally reached impasse on on October 31.

12       The first one is a witness on the named-plaintiffs'

13   transactions.  We have been seeking a witness throughout the

14   discovery process on named-plaintiff transactions.

15       Chase has taken the position, which I think I

16   understand and don't think is completely unfair, that there

17   are too many named plaintiffs for any one witness to be able

18   to testify about what happened in the context of those

19   transactions.

20       So we've offered a series of compromises and worked for

21   a long time to try to come to an agreement where we could

22   get at least some testimony about what happened to the named

23   plaintiffs and why, about the questions we have about the

24   documents that were produced, the questions we have about

25   why those loan modification processes failed, about why

PDF created with pdfFactory trial version www.pdffactory.com

1    denials were late after the relevant time period in the TPP

2    agreements, and we just haven't been able to reach a

3    compromise.

4        Every compromise we propose Chase will take the

5    position that they need to go back to the client.  Their

6    counsel will take the position that it needs to go back to

7    the client.

8        That process takes weeks, or sometimes a month.

9        We then hear back that the compromise has been

10   rejected.  We get ideas from them about other compromises

11   that might work, and then we work to something that we think

12   might have resolved the issue.  And what's happened is that

13   we did not reach an impasse on this issue until October 31.

14       We've proposed compromises, for example, that we would

15   just use some of the plaintiffs as exemplars.

16       We've proposed that we take as few as eight of the

17   plaintiffs, use them as exemplars, and get a witness who

18   would answer questions about those eight files.

19       We've asked -- we've agreed to limit the questioning to

20   what's available in the written files that were produced to

21   us so that Chase wouldn't have to prepare a witness on a

22   variety of oral communications between the plaintiffs and

23   Chase employees.

24       We've asked that -- you know, we've proposed that we be

25   allowed to ask about those things that are represented in

PDF created with pdfFactory trial version www.pdffactory.com

1     the data, and Chase has refused a witness on them.

2          That kind of a deposition is extremely important.

3     We're entitled to know what happened to these plaintiffs

4     both for typicality and for commonality, and we're at a

5     point where we're months into this discovery process, and

6     Chase finally refused to produce any witness at all about

7     the named-plaintiff transactions.

8          Another witness issue, your Honor, is a witness about

9     the Fair Debt Collection Practices Act.

10         I'm not going to go through every aspect of this

11    particular dispute in detail, but what happened here is that

12    Chase itself suggested that we depose a witness, rather than

13    force them to give us a variety of documents that they've

14    told us was too burdensome to produce.

15         So we proposed exactly that.  We proposed that we take

16    a witness deposition on what happened to borrowers under the

17    Fair Debt -- you know, on the aspects of the case that have

18    to do with the Fair Debt Collection Practices Act, to get

19    Chase's testimony about its demands for payments, why

20    they're inconsistent with the amounts owed under loan

21    modification agreements, and about the status of loan

22    modification -- communications about the status of loan

23    modification processing.

24         Chase then said that they didn't want -- they wouldn't

25    produce that witness because we hadn't had a notice for it.

PDF created with pdfFactory trial version www.pdffactory.com

1       So we amended our 30(b)(6) notice to add that issue,

2   and then Chase still refused to produce the witness in

3   October of 2012.  So we have not been able to reach

4   agreement on a witness who would testify about Chase's

5   compliance with the Fair Debt Collection Practices Act.

6       The other two issues in the motion to compel are

7   privileges and -- privilege claims and redactions in

8   connection with audits.

9       Chase acknowledges in its response to the motion to

10  compel that it has finally raised those issues with the

11  agencies that are involved.  Remember, the bank examiner's

12  privilege that Chase claims is not Chase's privilege but,

13  rather, the privilege of the bank examiner.  What the

14  regulation requires is that Chase, when it has a request for

15  documents it believes are privileged, is that Chase go to

16  the bank examiner, notify them of what documents are being

17  requested, and get the bank examiner's position on it so

18  that the bank examiner can come in either -- in this case

19  either the OCC or Treasury, could come in and argue that

20  these documents are, in fact, privileged from the agency's

21  perspective.

22      What's missing from Chase's brief is any sense of when

23  they finally made that request.  It appears to us, reading

24  between the lines, that that request was first made in

25  October.  And Chase says that the reason it wasn't made

 1    until then was that they didn't know exactly what documents

 2    might have been responsive to the question.

 3        And what's unfair to us, your Honor, is that we lose

 4    the opportunity, by that late request of the bank examiner,

 5    to get the bank examiner's position, to have those issues

 6    resolved, and, in fact, to have you look at the documents.

 7    Because even if the bank examiner claimed they're

 8    privileged, case law is that it's a qualified privilege; and

 9    that if you conclude that the findings of the bank examiner

10    are sufficiently probative, you can override the bank

11    examiner's claim of privilege in this context.

12        So we've lost that opportunity because Chase apparently

13    waited until the eleventh hour again to raise the claims of

14    privilege with the bank examiner.

15         Another issue, and the last one I'll put forward now,

16    is the issue of email in the motion to compel.

17        You ordered that Chase produce email for a limited

18    number of custodians on September 21.

19        We, on September 24, sent a list of custodians whose

20    email we would like to have search terms applied to.  We

21    sent a list of search terms.  We asked Chase to run at least

22    a sample of those search terms so that we could get some

23    sense of whether they would yield a burdensome number of

24    emails for the purposes of review.

25        As of today, as far as I know, we don't have any data

1  about the number of hits, and that's just inconsistent with

2  the discovery process in complex litigation around the

3  country.

4       The way email searches work in most complex litigation

5  is that the parties try to work together in order to

6  evaluate search terms to make sure that the proposed search

7  of sometimes hundreds of millions of emails -- in this case

8  it's probably a lot less than that -- is not burdensome.

9  And the way the process works is that the defendant runs at

10  least a sample so that we can get some sense.  If the sample

11  shows that a particular search term is yielding 25,000 hits,

12  that's something we'd understand.  I would be happy to work

13  with Chase to modify a search term that yielded that many

14  hits.

15       But you ordered this September 21.  As far as we know,

16  they haven't even run any of the proposed search terms.  And

17  instead what they've done is that they've insisted

18  unilaterally for them to even run the proposed terms, that

19  we have to narrow them, modify them.

20       And we've tried to do that.  There's a series of

21  letters in the discovery record at Exhibits 9 through 12 to

22  my declaration that show just how hard we've worked to

23  narrow the discovery searches.

24       But Chase, while taking the position that we're not

25  entitled to any extension of time here, is unilaterally

PDF created with pdfFactory trial version www.pdffactory.com

1    granting itself an extension of time to produce email after

2    the close of the discovery period that it's urging on the

3    Court.

4        You could rationally ask, you know, Why is it important

5    that we get email?

6        I think the answer is twofold:  First of all, there is

7    no distinction between merits in class discovery and this

8    case.  And, even if there were, there's less distinction

9    than ever before in light of the Supreme Court's decision in

10   Dukes v. Wal-Mart.  So to the extent that an email is

11   relevant to the merits, we should be entitled to it in this

12   phase of discovery.

13       Second, if you're concerned about making sure we get

14   our class certification discovery early on, we should be

15   entitled to the attachments to the emails that Chase has

16   that are unavailable.

17       Witness after witness has told us that reports that

18   they rely on in their work every day about loan modification

19   processes, about HAMP, about statuses of particular

20   borrowers in loan modification, come to them as attachments

21   to emails.

22       So until the email is searched, Chase takes the

23   position that they can't produce this material.  When they

24   search the emails, they will find the attachments and,

25   presumably, produce the material that they say can't be

1    otherwise gathered.  Because that's what witnesses have told

2    us they would do in order to gather information that's

3    responsive to the request for production of documents.

4        That's what I have, your Honor, for now.  I think it

5    makes sense for you to hear from Chase, but I would,

6    obviously, like to be heard on the issue of deadlines and

7    what should happen in connection with those.

8        THE COURT:  Thank you.  That is helpful in at least

9    understanding the plaintiffs' position.

10        For Chase?

11        MR. AGOGLIA:  Your Honor, Michael Agoglia for

12    Chase.

13        I would like to address a couple of, really, your

14    threshold questions, and I will turn over some of the issues

15    relating to some of these witnesses to my colleague,

16    Ms. Kleine.

17        I am embarrassed about what's happened with discovery

18    in this case.  I have been practicing almost exclusively in

19    this area of law for over 20 years.  I have had, I think at

20    this point, several hundred class action cases.

21        Routinely in those cases, the record will show, there

22    is rarely, if ever, a motion -- a single motion to compel

23    filed.  As you recount, this is, at least, I think, the

24    tenth affirmative motion brought by plaintiffs here.

25        We have prosecuted three ourselves successfully.

1        It really shouldn't go like this, and it has not been

2    for want of effort.

3        It does sit with ill grace to hear plaintiffs beat the

4    familiar drum of delay and intransigence.

5        Absolutely not.

6        There was a Herculean effort that we spearheaded to

7    produce early the core of the documents related to policies,

8    practices, procedures that involve this modification issue,

9    and to produce those with respect to the time period that, I

10   submit to you, that you're going to find is most relevant.

11       All of the plaintiffs came in for modifications during

12   the very earliest part of the program, and that's why they

13   march under the banner of this contract claim, because it's

14   only during this very initial period that that form ever

15   existed.

16       They've had hundreds of thousand of pages of documents

17   produced to them.  We have reviewed approximately 1.5

18   million pages of documents in compliance with our discovery

19   obligations here.  We understood the Court rejected our

20   request to bifurcate, and that put us under a different time

21   frame; and the *quid pro quo* is we would have a reasonably

22   constrained period within which both parties would exercise

23   the discipline to get to the heart of the case.

24       That simply didn't happen here.

25       The specific issues on the table today are

PDF created with pdfFactory trial version www.pdffactory.com

1    illustrative: the data, the emails, the reports.

2        Plaintiffs' initial position taken through the

3    summertime -- discovery began the first of the year, your

4    Honor -- was, We want everything.  We want every single loan

5    level data for every putative class member around the

6    country.  We want all the emails.  We want every draft of

7    every policy, procedure, and manual that Chase has ever

8    produced here.

9        That was their position.  The Court heard them out in

10   the summer time and said, No, no, no.

11       Their fallback was developed months later and brought

12   to the Court's attention in September.

13       Chase had a principled objection to what was even their

14   fallback position on each of these items.

15       And the Court in the September motion to compel didn't

16   say, Yes, plaintiffs, your compromises are reasonable.

17       On the data, the Court compelled one-tenth of what had

18   been their compromise position.

19       So, yes, it is embarrassing that we have had to come to

20   the Court for this level of supervision, but it is not the

21   case, as the record amply demonstrates, that that's because

22   Chase has taken unreasonable or dilatory tactics in response

23   to what plaintiffs have insisted upon.

24       Now, as we articulated in a number of detailed

25   declarations in connection with that last motion to compel,

PDF created with pdfFactory trial version www.pdffactory.com

1   the production of these data sets is actually burdensome.

2       You told us to go provide a more limited sampling, and

3   we did that, and we did that with transparency, immediately

4   telling them, Here's the process we would be using, telling

5   them that we expected to get that to them on November 2.

6       It is a measure of where we are that we've heard three

7   times in their briefing and twice from Mr. Klein at the

8   podium today that it only arrived November 1 in the evening.

9       They understood from what we had said, both in our

10  motion and afterwards, what it would take to produce that

11  data, and it was, indeed, a Herculean task to get that

12  assembled and prepared so it could be produced to them.  It

13  was produced a day early at 5:30 p.m. when it went out.

14  They downloaded it the same day.  But they had the data.

15      Now, they knew the data was coming on that date when

16  they asked you for the last extension, an extension to which

17  we agreed, an extension of the discovery cutoff and the

18  supplemental expert reports.

19      But they didn't tell you in that request, Oh, and we

20  expect when we get the data to want to ask questions through

21  a witness, and so we need to extend this again -- this is

22  illusory -- because, as soon as we get the data, we're going

23  to look through it, and we're certainly going to have

24  questions.

25      The truth is these are exactly the type of things

 1    reasonable attorneys could have worked out through

 2    follow-up, informal questions.  What don't you understand

 3    about the data?  There are 70,000-plus fields.

 4        And what's characterized the impasse here is the

 5    refusal, steadfast, to articulate anything specifically

 6    about what they don't understand.

 7        Let me give you the example that they've highlighted

 8    here today, the weekly dashboard.  That's not a data sample.

 9    It's a weekly report.

10        Ms. Fetner, a 30(b)(6) witness, was asked questions

11    about that in her deposition in August.

12        What Mr. Klein hasn't said and could not say is, Other

13    versions of that document weren't previously produced.  It's

14    a weekly report that they didn't have the opportunity months

15    ago to look at it and ask whatever questions they cared to

16    ask about it.

17        There are over a quarter million pages of documents

18    that they've received in discovery.  They could select any

19    document in isolation today and say, Well, there might be

20    questions we want to ask about that.  But that's why there

21    are discovery periods and discovery closes, to discipline

22    the parties to prioritize what's really important.

23        So that really -- that does sit with ill grace that

24    they've selected that document, which they can't say they

25    didn't have versions of before and say, Well, the

```
 1   supplemental production, the ongoing, rolling production,
 2   the updated production from the most recent time period, is
 3   reason why they still need another witness for each and
 4   every such document.
 5        So I would say what has been the greatest frustration
 6   is to come back to them on things like the named-plaintiffs'
 7   loan files, in their possession in many instances for over a
 8   year, and to hear them now, at the end of discovery saying,
 9   Well, we just want a witness to ask some questions, and
10   we're not going to tell you what those questions are, what
11   they go to, what areas you need to be prepared to have a
12   witness respond in.
13        That's just not how any reasonable discovery should
14   take place.
15        I do these cases all the time.  There is almost never
16   an occasion where one witness can meaningfully testify about
17   a loan file, even an individual loan file.  They're, on
18   average, nearly 4,000 pages in length.
19        If they have a specific question, we have invited them
20   for months, Tell us what you don't understand.
21        We've conducted with them over 60 meet-and-confer
22   sessions which, I assume, average at least more than an
23   hour.
24        We have not -- we have not -- shirked what we
25   understood your Honor to tell us in chambers about how you
```

PDF created with pdfFactory trial version www.pdffactory.com

1    would hold our feet to the fire to make sure discovery was

2    conducted properly.

3         But that's how it should have happened.

4         If they have any specific questions -- I mean, they

5    can't even articulate for you today, having these documents

6    for well over a year for many of the named plaintiffs and

7    for over six months for the rest of them, a specific

8    question that they have that they need an answer to.

9         And it's improper at the end of discovery to say, And

10   now we just want you to put somebody up to ask whatever

11   questions we want to ask, but we'll leave aside the policy

12   and practice questions.

13        Well, they've had 12 different 30(b)(6) depositions.

14   That's where they were supposed to ask the policy and

15   practice questions and have somebody be in a position to

16   answer.  I couldn't possibly begin to start preparing

17   somebody for that.

18        The loan file example, let me continue with that.

19        In any given loan file, even if they limit it to stuff

20   relating only to modifications, you have questions about:

21   Were they in default?  Why were they in default?  Did they

22   ask for a modification, or did Chase solicit them and say,

23   You should explore options as an alternative to foreclosure?

24   Did they seek first a forbearance or repayment agreement?

25   Did they perform under those agreements?  Did they pursue a

1    trial modification; if so, when?  Who was the investor?  Was

2    it Freddie Mac, Fanny Mae, VA, FHA, the USVA, all these

3    governmental entities and other investors who have

4    completely separate programs, and programs which have

5    evolved continuously over this time period.  Did the

6    borrower make the payments required under the trial?  Did

7    they sign the trial?  Did they submit the required

8    documentation?  What documentation was asked of them, what

9    the follow-up communication was.  Were they in bankruptcy?

10    Were they approved?  Were they denied?  What was the

11    underwriting?  Were there glitches in the underwriting?  Why

12    were there glitches in the underwriting?  Were they offered

13    a final modification?  Did they sign it?  Was the

14    modification sent to the system and boarded consistent with

15    the terms that the borrower understood?

16        Each and every one of those functions involve different

17    groups, different teams, different divisions.

18        We have said to them again and again, If you look at

19    the loan files, you will see on average something like 100

20    to 150 different people who touch those files.

21        It is a complete and utter nonstarter, and we have had

22    this conversation for months.

23        Tell us any specific question that you have about any

24    particular loan file, and we will work with you reasonably

25    and informally to get you an answer.  And if you need that

PDF created with pdfFactory trial version www.pdffactory.com

1    formalized, we'd be happy to verify that.

2        But that's how reasonable discovery in these

3    circumstances should have proceeded.

4        The same is true with the data.  The same is true with

5    these reports.

6        I heard Mr. Klein stand before you now and say they

7    didn't get audits until just recently.  It's just not true.

8        I'll refer you to our opposition papers on that.

9        What I would like to do is turn over to Ms. Kleine the

10   specific questions of why the request for an additional

11   witness on the audits, the data sampling, and reports, and

12   spreadsheets are improper.  But I'll tell you what

13   characterizes each and every one of them is an inability, a

14   steadfast refusal, to specify what the particular questions

15   are.  Except I get -- if they're close to articulating a

16   particular question, it's something that could have been --

17   it illustrates why it could have been resolved.

18        Their expert, for instance on the data sample, says,

19   Well, there are some fields here that are omitted.

20        Well, it's actually not the field that's omitted.  It's

21   that the -- there's not a value filled in for each borrower

22   in every single one of the tens of thousands of fields.

23        The only example, I think, they bring up is foreclosure

24   and bankruptcy.  Some of those fields are blank.

25        Well, yes.  For borrowers who are not in bankruptcy or

1    not in foreclosure, there will be no value in those fields.

2    There's no real mystery to this.

3         But that's the sort of thing that could be cleared up,

4    should have been cleared up, quickly, readily, informally.

5         I'll come back.  I'll talk a little bit about the

6    FDCPA.  I promise to be brief there.  I think that's a

7    pretty straightforward issue.  And we can discuss with your

8    Honor any questions about the outstanding request for an

9    extension, an additional extension.  Effectively, they've

10   gotten an additional extension of several weeks already by

11   virtue of their emergency motion and the Court's suspension

12   of the experts' supplemental deadline.

13        THE COURT:  All right, Ms. Kleine.

14        And we'll have to move on a little bit because I've got

15   another hearing that I was actually going to start in five

16   minute, but clearly won't.

17        MS. KLEINE:  Thank you, your honor.

18        Let me just briefly address what is, perhaps, a lack of

19   clarity on our InfoOne reports and spreadsheets.

20        The facts are that Chase has produced a rolling

21   production of reports and spreadsheets going back to the

22   Durmic matter, which, as your Honor knows, was -- it feels

23   like some time ago.

24        Even with respect to the document requests in this

25   case, Chase was engaged in our rolling production in August

1    well into September.

2        And the history here is that, as your Honor knows, in

3    September plaintiff moved to compel additional reports and

4    spreadsheets.

5        Chase responded that we had already produced very many

6    of them, giving just a few examples:  Executive Steering

7    Committee reports, inventory reports, business reviews,

8    quality control reviews, weekly updates, all of which

9    contain numerous data, statistics, analyses, internal and

10   external.

11       And, in addition, plaintiffs moved to compel a narrow

12   subset of reports that the deponent Karen Shine discussed at

13   her deposition.  She was a percipient witness who was

14   involved in pulling data regarding a preliminary injunction

15   motion in <u>Durmic</u>.

16       As a result of the Shine deposition, plaintiffs asked

17   for some additional reports that Ms. Shine talked about.

18       Chase produced some of them, objected to the production

19   of others.  And plaintiffs also asked for the continued

20   deposition of Ms. Shine to review the reports that Chase

21   produced as a result of the motion to compel in September.

22       The Court granted the motion to compel in part and

23   denied it in part.  The part that it granted was that Chase

24   was to produce certain reports discussed at Ms. Shine's

25   deposition.  The part that the Court denied regarding

PDF created with pdfFactory trial version www.pdffactory.com

1   reports and spreadsheets was the re-deposition of Ms. Shine

2   to talk about those reports.

3        So now at this point Chase complied with the Court's

4   order and produced the reports that Ms. Shine discussed at

5   his deposition.

6        Now we have two issues.  Plaintiffs are essentially

7   repeating their request to call Ms. Shine again to discuss

8   those reports.  We submit that nothing has changed and there

9   is no need to recall her.  Second, there's been the

10  representation made that Chase only produced reports dating

11  from 2011 to present.

12       That's simply not true.  There is really no other way

13  to say that.

14       Yes, the Shine reports produced that were the narrow

15  category discussed at her deposition happened to relate to

16  2011 and 2012 and not before.  That's what Chase was ordered

17  to produced.  That's what Chase produced.  However, it has

18  produced numerous, numerous, numerous data, spreadsheets,

19  reports relating to 2009 and, in fact, back to 2008.

20       We see similar issues with the data production which

21  Mr. Agoglia discussed in some detail already.  But the fact

22  is is that that production which, for the named plaintiffs

23  alone, contains over 70,000 fields of data and for the class

24  contains literally millions, includes data going back to

25  2008, or, in the case HAMP borrowers, 2009 when HAMP was

1    implemented.

2         But, again, if plaintiffs have specific questions about

3    that, Chase has offered to review any reasonable questions

4    and provide a response.

5         To the extent there are questions about methodologies

6    that weren't explained in the letter that we sent in

7    October, again, that's something that we can discuss.

8         The other point that I wanted to bring out on that

9    which doesn't seem to have come out is that there is

10   actually no 30(b)(6) notice that goes to the info on data

11   production.

12        There is a notice for named-plaintiff loan files, which

13   we're discussing separately, but it has nothing to do with

14   the data production.

15        And there is a request for Chase's electronic systems.

16   Chase has produced, in fact, multiple 30(b)(6) witnesses

17   who've talked about Chase's electronic systems.

18        Neither one of those requests actually has anything to

19   do directly with the info on data production.  And so while

20   Chase is willing to engage in a corrective meet and confer

21   about that, given that there is no 30(b)(6) notice actually

22   served on the topic, this all feels rather far afield.

23        The third related witness topic is for a witness to

24   talk about audits.

25        Now, as we've discussed, Chase objected to that request

1    in April, and has consistently objected to that request in

2    large part because there was already a 30(b)(6) deponent on

3    that topic, Ms. Fetner, who has now been deposed multiple

4    times.

5         The response that we have been given is that plaintiffs

6    need to know what was redacted from the audits that she's

7    produced.  But, aside from our very lengthy meet-and-confer

8    telephone conversation, which I have had the pleasure to be

9    a part of on the topic, we also produced a privilege log.

10   And the privilege log revealed all of the non-privileged or

11   highly confidential material that was redacted in some

12   detail.  And rather than review that log on November 9,

13   which was the date that the parties had agreed to to produce

14   the log, plaintiffs elected to file the motion to compel

15   instead.  And we would suggest that the rational way to deal

16   with any questions the plaintiffs have is to review the log

17   and, as would be standard, present any reasonable questions

18   they have about the log to us so that we can continue the

19   conversation, if necessary.

20        Finally, there are two issues with regard to documents

21   only as opposed to witnesses.

22        The first, which you've heard some bit about, are

23   audits that MHA-C, a division of Treasury, performed on

24   Chase and related communications.

25        The parties seem to agree that that privilege belongs

1    to Treasury, which is correct.  Chase has the obligation to

2    assert that privilege and can face criminal penalties if it

3    produced documents contrary to its agreement with Treasury

4    not to do so.

5         The sticking point seems to be the assertion that Chase

6    has held up the process by not informing the Treasury

7    sooner.

8         As plaintiffs have now acknowledged, Chase had, in

9    fact, informed Treasury as soon as it realized what

10   documents were at issue.  But the more important point is

11   that while Chase does have a duty as a regulated entity to

12   inform Treasury when it receives such a request, plaintiffs

13   have a separate obligation to pursue their own discovery.

14        Chase's informing Treasury of this issue has nothing to

15   do with this plaintiffs pursuit of this discovery.

16        For example, in the parallel loan modification

17   litigation pending in Los Angeles, this issue came to a head

18   many months ago in June.  And the judge in the Central

19   District of California in response to a nearly identical

20   motion to compel informed plaintiffs that they would need to

21   pursue their administrative remedies with Treasury and the

22   OCC, and that the bank in that case would not be permitted

23   to produce the documents until plaintiffs had done so.

24        In this case it's, I suppose, revealing that apparently

25   plaintiffs felt no such exigency here to pursue this issue

1    until now.  And, in addition to that, counsel has served

2    subpoenas on many different related entities, all of whom,

3    it is our understanding, has vigorously asserted their

4    privilege.  So this issue really should come as a surprise

5    to no one at this point; and, in any event, Chase's hands

6    are really tied until Treasury gives its opinion, which we

7    have no reason to expect will not be timely provided.

8        But I wanted to note a point, that while we shouldn't

9    even be getting here, because plaintiffs have not actually

10   pursued their administrative remedies properly, it's worth

11   noting that this entire issue is resting on a document that

12   was inadvertently produced, that was unquestionably

13   privileged, which reveals the review processes, findings,

14   and analyses of a government regulator and which Chase

15   properly informed plaintiffs of and produced a redacted

16   version of that document, and which, apparently contrary to

17   a protective order and Rule 26, plaintiffs retained anyway

18   and used in connection with this motion.

19       But, even aside from that, the main point is that the

20   key really is for plaintiffs to pursue their remedies with

21   Treasury, that's simply black letter law.

22       The only legal response is that the Sixth Circuit has

23   held that that's not necessary, but that's a minority view.

24   We've cited numerous decisions throughout the country that

25   don't hold that view.

1    The Sixth Circuit's view is rested on an opinion that

2    Congress has exceeded its -- that the regulators have

3    exceeded their delegated authority by issuing these

4    regulations, which is really something that's pretty far

5    afield and that other courts have not agreed with.

6    And even if the Court were inclined follow the Sixth

7    Circuit for some reason, courts within the Sixth Circuit

8    still hold that Treasury has to be given the opportunity to

9    weigh-in, which it has not yet done here.

10    Finally, and quickly, just the email production.

11    The main point seemed to be that Chase has not timely

12    sampled the search terms that plaintiff has provided, and I

13    want to give quickly a little background to that to show

14    that that's really a red herring here.

15    When plaintiffs began asking for an email sample, Chase

16    said that we would consider it.  We needed to know who the

17    custodians were and the approximate identity of the search

18    terms, because we saw how a similar process unfolded in

19    parallel litigations and really held up those litigations.

20    Plaintiffs refused to provided us the list of

21    custodians.  So we couldn't collect the data.

22    Once we received the list of custodians, we immediately

23    began collecting the data, which is quite large.  As we said

24    in our opposition, it's about 116 gigabytes, which

25    translates to about 11 million pages of emails.

1    So Chase is working diligently to collect them, and

2    expects to be done collecting them soon, and, in parallel,

3    is conducting what we believed was an extreme and productive

4    meet and confer with counsel for plaintiffs about the search

5    terms.

6    We began with a list of the search terms that included

7    words like "felon, federal debt, collection," and a long

8    list of expletives that do not bear repeating here.

9    We obviously felt that that would not be a productive

10   way to start, and while we collected the documents, we

11   worked on producing a more reasonable list of search terms

12   with which to begin.

13   We think that we're very close there.  The parties have

14   been engaging very seriously in conversations about those

15   search terms for weeks, but given that the search terms

16   aren't even finalized yet, it seems difficult to produce by

17   the deadline plaintiffs have requested, given the volume of

18   data, and, in fact, would not be possible.

19   But, all that said, once the documents are available

20   and the searches are run, Chase is ready with a large team

21   of attorneys that it is hiring to review those emails in

22   what is really an extraordinarily fast amount of time,

23   little over a month over the holidays, to review millions

24   and millions of pages of documents.

25   And both in their briefing and here we really haven't

PDF created with pdfFactory trial version www.pdffactory.com

1    heard an explanation of why that is not adequate.

2        Plaintiffs' experts, for their part, submitted

3    declarations explaining what they needed in order to submit

4    the reports, which, after all, is the focus here today,

5    their expert report deadlines.  And they did not mention

6    emails.  They're focused on the data.

7        The plaintiffs have said that they need the

8    attachments, which is puzzling because, as already

9    discussed, Chase has produced numerous reports and

10   spreadsheets that would allegedly be attached to emails.  So

11   those documents would already be in plaintiffs' possession,

12   to the extent they were called for by their document

13   request.

14       So aside from discovery for its own sake or -- there

15   doesn't seem to be any real exigency to imposing a deadline

16   this is not possible to meet on email, in any event.

17       If the Court has more detailed questions about email

18   production and/or any of the other items I have been

19   discussing at length, I would be happy to respond to those.

20           THE COURT:  No.

21       I think what I take away is that no one has done

22   anything that has satisfied the other side on any single

23   issue in this case.

24       I think it might be useful -- this is actually helpful

25   in the sense of understanding where the differences are and

1    will help me in fashioning an answer to the motion to

2    compel.

3         But I think perhaps what we might most productively do

4    now is just spend a few minutes on what we're doing with the

5    deadlines in the case.

6         All cases are important.  This happens to be a very

7    important case.  But, like all judges, I have to do more

8    than one case at a time.  And my concern is that I want this

9    case to get the attention it deserves, but once I get

10   involved in the <u>Bulger</u> matter next summer, I will be as

11   attentive as I can, but I cannot guarantee I can focus the

12   way I would like to on the case.  So I would not like to see

13   deadlines slip in a way that two important cases collide

14   with one another in a way that one -- and, given the rules,

15   the criminal case, obviously, takes priority by law.

16        So there are external pressures on me, as well as

17   trying to deal with what clearly is a lot of disagreement

18   that I am not usually accustomed to in these kinds of cases.

19             MR. AGOGLIA:  Your Honor, I appreciate that.

20        I think, first, the next critical event, apart from

21   summary judgment motions, which we think will help

22   immediately clarify some of these specific issues for your

23   Honor, will be class certification.

24        No one is suggesting that the February 15 deadline for

25   plaintiffs to file their motion for class certification

1    should be moved.  We have told you we think one of the

2    things that explains why what doesn't make sense isn't

3    making sense in terms of the conduct of discovery.  There

4    may be other tactical considerations where Mr. Klein is much

5    more eager to have the class certification heard in the

6    Central District of California in the Citi case than here.

7    But February 15 is sacred --

8         THE COURT:  Maybe you have a smarter judge there.

9         (Laughter.)

10         MR. AGOGLIA:  I doubt it.

11    -- is sacred.  No one is asking for that to be moved.

12    I propose, consistent with our positions here, that we

13    would respond within three business days to any of the

14    specific questions that they have raised about the data

15    sampling.

16    If they have any specific questions about the loan

17    files, that shouldn't affect any deadlines whatsoever.  It

18    doesn't impact their expert reports.

19    But on the data sampling, which is the only thing their

20    experts say they need questions answered, to the extent

21    they've raised any specific questions, we'll answer those in

22    three days.

23    They submitted to you that they wanted an additional

24    two weeks til November 19 to file their supplemental

25    reports.  Again, this deadline has been move, I think, six

1     times all already, six times.

2          They've gotten another two weeks through this motion.

3     I'd give them until Monday, the 3rd, to get those

4     supplemental reports in to allow us to have rebuttal expert

5     deadlines moved by the same period of time.  And that

6     shouldn't impact anything.  That should keep us on schedule.

7     That's the reasonable way, I propose, that we proceed on

8     this issue.

9          And let me just round out.  I promised you I would say

10    something very briefly on the FDCPA.

11         There are two notices.  You don't say it's part of one

12    notice because you characterize the title as a

13    "supplemental" or "amended" notice.  There are two

14    deposition notices.  The rule says you get one.  And there

15    would be no reason, had they moved for leave, why the Court

16    would have granted it.  They've had seven witnesses, four

17    30(b)(6) witnesses, three percipient witnesses, who they've

18    asked about:  What are the underlying facts related to

19    FDCPA?  What are the borrower communications?  What are the

20    borrower communications about collection of amounts due?

21    When do they happen?  How do they happen?  Melisa Salts,

22    Judy Lockhart, Justin Pepperney, Vincent Scudds [ph.], all

23    30(b)(6) witnesses on borrower communications, oral and

24    written.  Four.

25         And then percipient witnesses:  Vicki Brown-Wilson, who

1  they asked specific FDCPA questions of.

2      So they had four full, fair, ample opportunity over

3  seven depositions to ask questions relating to the actual

4  facts that underlie any FDCPA claim.  What are the types of

5  communications that you send to borrowers, including in a

6  class context, the form letters, form documents and

7  packages.  They had full and fair opportunity.  They

8  actually took advantage of it.  They asked them the FDCPA

9  questions.  We produced thousand of pages of FDCPA and

10  collections-related documentation to them in discovery.

11      The rule that you get one bite at the 30(b)(6) apple

12  should be respected here.  This is a violation of it under

13  the Ameristar case.  Clearly it's a violation of it under

14  the rule.  And, plus of which, had they actually asked for

15  leave as they were required, it wouldn't have been

16  appropriately granted.

17      So I think that is the proposal that we would submit to

18  the Court in terms of a reasonable seventh extension of the

19  supplemental expert deadline, and that's the only deadline

20  we propose that the Court move.

21      THE COURT:  Okay.  That was succinct.

22  Last thoughts, Mr. Klein?

23      MR. KLEIN:  Your Honor, a couple of things.

24      The proposed deadline changes don't affect the class

25  certification process.  Some part of how fair the new

1    deadlines might be would turn on what you intend to do with

2    this motion.  To the extent we have relief, we're going to

3    need some cooperation from Chase in order to accomplish what

4    we need to accomplish to get to class certification.

5         We'd obviously like to do it as quickly as possible.

6         One of the issues, your Honor, and there are a number

7    of disputes that are no more -- no closer to being resolved

8    at the end of this hearing than they were before.  For

9    example, Chase has stated to the Court that it has produced

10   dashboard reports from a period of time prior to March 2011.

11   We have combed the production and have not found them.  We

12   have asked Chase to point to them in the production.  We

13   believe that if Chase had produced them they would have

14   given you a list of Bates numbers in their response.  None

15   of those things have happened, your Honor.

16        So one very important issue here is why don't we have

17   the reports that generate statuses for borrowers in loan

18   modification processes, which are about the most relevant

19   documents there are for class certification at this late

20   stage of the discovery process.

21        THE COURT:  I think I can get you an answer to that

22   question in three business days.

23        MR. KLEIN:  Well, your Honor, that may well be

24   true, and if we got that answer, had we had that answer,

25   maybe we wouldn't have been here on this.  But it's a

1    question we've asked over and over again in this extended
2    meet-and-confer process we've had.
3        We have done what Chase says we haven't done.  We've
4    given them specific questions.  We've given them examples of
5    questions, and they have declined to answer in their
6    meet-and-confer.
7        It isn't as if we want to be here on a motion to
8    compel.  It isn't as if we've ignored the meet-and-confer
9    process.
10       There's a record of letters.  There's another several
11   dozen letters we could and would produce to the Court if you
12   have any doubt about our good faith in the process of trying
13   to get answers to the kinds of questions we're still raising
14   today.
15       What we'd like, your Honor, is an extension that takes
16   into account what you order Chase to provide to us in the
17   remaining discovery process for this case.  So, for example,
18   if you do conclude that we are entitled to additional
19   witnesses so that we can get information about these very
20   complicated data and spreadsheet productions, then we
21   probably need a little bit more time.
22       To the extent you don't give us that relief, our
23   experts aren't going to simply not do anything.
24       I do want to point out that when Chase complains we
25   didn't have our experts ready to go on November 2, we

1   couldn't have known what was coming in that production.  We
2   got 389 spreadsheets that are important to this case on
3   November 2.  There was no way our experts could assimilate
4   them in seven days.

5       That was particularly true because each of our experts
6   are in the Mid-Atlantic region.  Each of them had some
7   hardships associated with Hurricane Sandy.  They're behind
8   on other works.  So the idea that we should have produced
9   this supplemental reports in seven days really isn't fair to
10  the experts or to the plaintiffs.

11      What I think we need, your Honor, at this point is more
12  than a couple of extra days.  We need some time for the
13  experts to get the answers, understand the answers, that
14  we're asking for at this point, and then to do a considered
15  job of giving you the information that you need to
16  understand our position for class certification.

17      So, for example, once we understand the data sample,
18  whether it's by further meet-and-confer discussions or
19  because we get another witness, experts need some time to
20  assimilate those answers and put them together in order to
21  produce a coherent document, consistent with the level of
22  expertise they bring to bear in this case.

23      We have two experts, each of which has already produced
24  a report in this case.  One is Professor Ian Ayres of Yale
25  Law School.  He's an expert in law and econometrics.  He

brings to bear a great deal of expertise, but he has a very,
very busy schedule.  And so the idea that he can turn on a
dime and produce a supplemental expert report in just a few
days is unfair to him.

Our other expert is Professor Alan White, who is at
CUNY Law School.  He has studied the HAMP processes, that
are at the heart of this case, for more than three years.
And, again, he would acting precipitously if he were to
produce a report without having more information about the
data sample at issue here.

Chase takes the position that there are 70,000 fields
of data on which we could inquire if we had a witness.
That's simply not true.  They produced a data sample that
consists of 88 fields and 88 field names.  So it's not as if
plaintiffs are going to ask about every cell in the data
sample.

What they're going to ask is:  What the field names
mean, how the field names are derived from Chase's systems,
how they're used in Chase's processes to evaluate loan
modification applications, and what the codes within those
data fields mean so that the experts can understand what is
in the data and how it can be used to ascertain the class
and establish commonality and typicality.

So, at the end of the day, your Honor, what we'd like
is sufficient time to assimilate whatever it is that the

 1    Court considers appropriate on this final motion to compel.

 2         Thank you very much for hearing us today.

 3              THE COURT:  Thank you.  This has been

 4    instructional.

 5         I do not want you to think from my earlier comments

 6    that I think anyone is not presenting the issues to the

 7    Court in good faith and presenting the truth as you each

 8    perceive it to be.

 9         I get the feeling that this is the kind of problem that

10    Mrs. Clinton has to address every day when you hear two

11    perspectives and there's a certain -- you know, from where

12    you stand, often the truth can look a little bit different

13    than it may be.  But I suppose that's why we have judges in

14    the middle, and we have a Secretary of State, to try to

15    mediate these issues.

16         I will try within the next day or two to put out an

17    order which is going to draw on some of what you both have

18    had to say, which I think will keep us on track to that

19    February 15th date.

20         Thank you, again for the hearing.

21              MR. AGOGLIA:  Thank you, your Honor.

22              THE CLERK:  All rise.

23         Court is in recess.

24         (Proceedings adjourned.)

25

**C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons                 December 6, 2012

_____
James P. Gibbons

JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jmsgibbons@yahoo.com